## GREEN *v.* STATE.

### ·(*Nashville.*   March  6,  1890.)

1. MURDER IN FIRST DEGREE.    *Facts that do not support defense of insanity.*

   The opinion discloses a state of facts upon which this Court is content to affirm a judgment of the lower Court pronouncing sentence of death upon one convicted of murder in first degree, whose only defense was insanity, and who attempted suicide at time of the murder.

2. INSANITY.   *Presumption as to mental state.*

   That state of mind, whether of sanity or insanity, in which a defendant is shown to have been recently before the commission of a crime, is presumed, in the absence of proof to the contrary, to have continued and existed at the latter date.

   Cases cited and approved: Haynes *v.* Swann, 6 Heis., 587;  Puryear *v.* Reese, 6 Cold., 28;  Overall *v.* State, 15 Lea, 672.

3. SAME.   *Plea of present insanity.*

   Present insanity must be specially pleaded in a criminal case, and cannot be shown under plea of not guilty.

   Code construed:  ₰2065 (M. & V.);  ₰1554 (T. & S.).

   Cases cited and approved: Dove *v.* State, 3 Heis., 374;  Firby v. State, 3 Bax., 358.

4. INDICTMENT.   *Variance in name of foreman of grand jury.*

   The minutes of Court showed that "C. J. Davis" was appointed foreman of grand jury.   The indorsement on the indictment—"a true bill"—was signed by "J. C. Davis, foreman of the grand jury."

There is no explanation of this discrepancy in the record. No question was made upon it in the lower Court.

*Held*: That this Court will presume that the discrepancy arose from mere clerical error, and that it is immaterial.

FROM PUTNAM.

Appeal in error from Circuit Court of Putnam County. JOHN A. FITE, J.

GEO. H. MORGAN, A. S. COLYAR, JR., WALTON SMITH, A. W. BOYD, JOHN S. DENTON, and J. S. WATSON for Green.

SNODGRASS & SMITH, District Attorney-general ALGOOD, and Attorney-general PICKLE for State.

CALDWELL, J. John W. Green is under sentence of death for the murder of Miss Ova Davis on June 18, 1887. He was tried twice, and found guilty of murder in the first degree each time. The trial Judge set aside the first verdict, and awarded a new trial, but pronounced judgment on the second one; and defendant has appealed in error.

Though a general plea of not guilty was interposed, the commission of the homicide by the defendant was virtually admitted, and the real de-

fense was that he was insane when the act was done.

The great body of the testimony on both sides was directed at the single question of the defendant's mental condition at that time. The jury found that he was sane, though instructed by the Court, in accordance with the rule laid down in *Dove* v. *The State*, 3 Heis., 373, that they could not so find unless convinced, beyond a reasonable doubt, of his sanity.

The principal contention of defendant's counsel before this Court is that the proof shows him to have been insane, and that the verdict is, therefore, contrary to the evidence.

On Saturday, June 18, 1887, when the act was committed, the defendant was about twenty-five years of age, unmarried, and possessed of a good character among his neighbors. The deceased was a young lady, eighteen years old, attractive, and innocent. They respectively lived with their parents in the same neighborhood, in Putnam County. The two families were on friendly and intimate terms. He had been her accepted lover; but a few months before the homicide he ceased to visit her, and another young gentleman—James Parks— became engaged to her. The fact that the defendant had been supplanted in the young lady's affections, and that she was soon to be married to Parks, seems to have been known and commented upon more or less extensively in the neighborhood; and several persons, his brothers among

them, say they had but recently "joked" the defendant about his rejection by the deceased and her preference for others.

Only the deceased and a sister two years younger were at their father's house when the homicide occurred. Her sister says:

"I was up-stairs at the time, and Ova was in the hall ironing. * * * I heard sister say, 'Don't you come in.' The defendant replied, 'I generally go where I d—d please.' I heard five shots. When I heard them I ran down-stairs and out at the back door, and went over to Albert Austin's. * * * After sister told defendant not to come in I heard sister say, 'Lord, have mercy!'"

John C. York, one of the first witnesses to arrive on the scene, describes it in these words:

"No one was there but John W. Green and the deceased. Both were lying on the porch. She was shot through the head, and was lying on her back. He was about two feet from her. I thought she was dead. I saw a pistol lying there. Two or three barrels were empty, and two or three cartridges in it, and some cartridges and empty hulls lying there on the porch. * * * The girl was left lying there until help came. Defendant was lying rather between the girl and the pistol, and the pistol in two or three feet of her head. After awhile he commenced groaning, and rolled off the porch, and lay there until his folks came."

This was about eight and one-half o'clock in the morning, and the young lady died "about two or three o'clock that evening."

The defendant had shot himself in the head several times, and was for hours expected to die at any moment. When his mother and other members of his family arrived, they took him to a spring near by, washed and bathed his wounds, and otherwise administered to his wants until near night, and then removed him home. While at the spring he was asked "why he had done this," and he replied, "That is the question;" and after some further conversation he said, "A man could always see after it was too late."

At home that night he gave a full account of the sad occurrence in its minutest details. He commenced by asking his brother where Ova Davis was, and, on being told that she was dead, said: "I told her of this six months ago. I told her well of it." George Parks, who claims to have heard that part of the conversation, as well as what followed, says: "He said there were two more he wanted to kill—Tom Cameron and James Parks; and he wished he had waited until Sunday, as he intended to do; that he could have killed them at Sunday-school; that they had been in his way with Ova. He said that Ova was in the porch ironing, and said, 'Don't come in,' and he replied, 'I will be d—d if I don't show you whether I don't come in or not,' and he went in, and she fell on her knees and commenced crying, and he

shot her.  He looked at her, turned her over, and saw the ball had gone straight through and come out on the other side of the head, and the brains were oozing out, and he saw her gape, and knew she was dead.  He said he then shot himself twice in the same place, in the back of the head, and his pistol snapped several times, and he took the loads out and reloaded it and shot himself again in the same place.  He said he had been watching for a chance for some time to kill her; that he had watched Davis' spring to kill her on Friday, a week before the killing, but she sang so pretty he could not kill her, and on the day before, but her sister Sallie was with her, and he couldn't have a chance.  He said he was up in the field, on the morning of the killing, pulling grass for his horse, and saw Mr. Davis and wife going from home, and he thought that would be his time to kill her.  He said he had made up his mind he had rather kill her and himself than see her marry another man."

Some eleven days after this the defendant was removed from his mother's house, and confined in the county jail on a charge of murder in the first degree.  J. C. Gabbert, the jailer, who had him in charge, was called as a witness by the State.  Referring to the defendant, this witness says: " I had a conversation with him.  He said he killed Ova Davis; that they had been engaged to be married, and had an agreement that if either went back on the other, that the one gone

back on should kill the other. That he under-
stood she and another fellow were to get married
on the next Sunday. * * * He aimed at
first to go to church and kill her, Tom Cameron,
and Jim Parks. He heard Davis and wife had
gone from home and crossed the river. He went
over to Davis' house and found deceased ironing
in the hall, and told her he had come to do what
he said he would. She fell on her knees and
threw up her hands, and he shot her in the head
and she fell over. He examined her, and found
the ball had gone in on one side of her head
and passed straight through and come out on the
other side. He then put the pistol to the back
of his head and fired twice. The second shot
knocked him down. He then snapped the pistol
a time or two, but it failed to fire, and he re-
loaded it and put it to the back of his head to
the same place and fired again. * * * He
said he thought he would kill her at the spring
once, but his heart failed him, she looked so nice
and pretty and he thought so much of her.
He said he thought he would kill her and him-
self, and both go to hell together.''

These quotations from the testimony sufficiently
show the details of the transaction, the antecedent
facts, and the motive prompting the defendant's
action, if he was capable of cherishing a motive.

It yet remains to refer to a great volume of
testimony touching the question of sanity or in-
sanity. It is an established fact that the defendant

had a severe and protracted attack of typho-malarial fever in 1881 or 1882, which made him delirious at times while the disease was on him. His mother, brothers, and some other persons say he was not so "social" after the attack as before, and that he frequently complained of pain in his head. Numerous other witnesses say that they had known him to "complain" of an unnatural feeling in his head, and ask if they could not "hear water slosh in his head" when he would move or shake it. He generally lived and worked on a farm. His brothers and one or two other persons say that in plowing on one or two occasions he acted strangely, running one or more furrows at one place between rows of corn, and then "skipping" several rows and plowing at another place; and, after that, going from one field to another irregularly and without good reason. They also state that he was at times unnecessarily ill and cruel with his work stock—whipping them severely when there was no excuse for it. His mother says: "John had a severe spell of fever about four years before the killing; he was sick several months. He was never right afterward. Had what I called *foolish spells* afterward. When he had one of these spells, or was about to have one, he would ask me if I could not hear the water slosh in his head. He would have nothing to do with the family or neighbors when he had those spells. * * * He had one of those spells on him for

two or three weeks before the killing. His conduct was strange. He complained often of his head. He stayed at home the night before the killing. * * He was sick and looked bad all the week before the killing, and complained of his head. He never worked any that week. He looked queer, and had queer looks. He looked bad and curious. He looked wild out of his eyes. He was always good to me. He did not eat much breakfast that morning. * * He looked wild that morning. I saw him after breakfast. He passed me at the milk-gap, and said something as he passed. He stopped, and then went on. He looked like he was looking at the creek. He was looking wild out of his eyes. From his actions, talk, and conversation I think he was insane. I do not think he knew right from wrong that morning, or when he had those spells on him. * * * Defendant had a pistol, a cow or heifer, a fiddle, and a horse."

Three of the defendant's brothers corroborate what their mother says about the fever, and its present and subsequent effect on his mind and conduct. Two of them make substantially the same statement as that made by her about his appearance on the morning of the homicide, and the fact that he had done no work that week. All of them and some other witnesses express the opinion that he was insane at times, or did not have mind enough to know right from wrong.

A large number of other witnesses, who claim

to have known the defendant well for a long while, say that they have no doubt of his sanity, and that they never heard it questioned before this prosecution commenced. Several of these say that they knew of his attack of fever, and afterward heard him complain about his head, but never for a moment suspected or had reason to believe that his mind was impaired in the slightest degree.

No member of his family ever before this time mentioned to any neighbor or friend that they entertained fears as to his mental condition, or called in a physician to treat him for a disease of the mind. Some of them say they had recently mentioned his condition to each other, and agreed among themselves that he had but little mind. Nothing was done or proposed, however, by any of them looking to his treatment, restraint, or confinement.

During all the years following his attack of fever he made his own contracts, bought and held his own property. He worked at home and away from home whenever he chose, just as his brothers did. When working for other persons he agreed upon the terms of service and received the wages himself; and never was there the least suspicion by any one, so far as the record shows, that he was not entirely competent to do so. He understood, discussed, and remembered the details of his business transactions. Not long before the homicide he was called home from a distant county,

where he had been at work several months, to undertake a delicate and difficult piece of work for one of his neighbors, who knew him well, and wanted his services because of his intelligence and reliability as a workman. The performance of this work involved the use of dynamite, which, to handle with safety, must always be handled with care. Some of his brothers joined him in the work, and together they performed it well and to the satisfaction of their employer. No one then thought that his mind was not perfectly balanced. Neither his employer nor his brothers thought it unsafe to risk him with dynamite, or to be about when he was using it.

Exactly what time elapsed between his mother's last sight of him at the milk-gap and the commission of the homicide is not shown; but it must have been about two hours, as appears from facts yet to be stated.

It is to be observed in this connection that his appearance and conduct on that morning were not of such a character as to excite any apprehensions on the part of his family, or to elicit any degree of watchfulness or restraint by them. He was allowed to go when and where he pleased. As he went away from home no one followed to see what would become of him, where he was going, or what he might do to injure himself or others.

In the meantime he was seen by other persons, who discovered nothing unusual in his appearance,

conduct, or conversation, and never once thought of insanity.

J. M. Stover says he has known defendant fifteen or twenty years—married his sister; had fifteen minutes' conversation with him about one and a half or two hours before Ova Davis was shot; "thought his mind was sound; saw nothing strange in his color, in his eyes, or in his manner, but all looked natural." He says further that W. G. Davis and wife, father and mother of deceased, had just passed his house when he saw defendant; that defendant asked him who they were, and when told, said he thought so.

Mat Martin says he is a cousin of defendant; has known him all his life; had exchanged visits and gone to school with him; "saw him early the morning of the killing." Continuing, this witness further states of the defendant: "He came from toward his house and went up the creek toward where W. G. Davis lived. He stopped and asked me about my sick colt. I told him it was getting better, and he looked at it and said it was getting all right. Defendant looked all right and well. His mind was sound that morning so far as I know. I saw nothing strange or peculiar about him that morning, nor the evening before, when he passed my house going toward home, at which time my colt was sick. * * * I never saw him when I thought he was of unsound mind, or that he didn't know right from wrong."

So that, whatever may have been the mental

condition of the defendant when seen by his mother and brothers at the breakfast table, and by his mother at the "milk-gap" on the morning of the homicide, he betrayed no symptom of unsoundness to Stover and Martin, his kinsmen and friends, who saw him later, and when he was actually on his way to the home of the deceased.

Much proof was introduced on both sides to show the state of the defendant's mind after the act, while he was at home and after he was committed to jail. On this subject there is much dispute. Some witnesses say he never talked connectedly after the commission of the offense, and others say the contrary. There is no doubt that he suffered greatly from the self-inflicted wounds, and that while so suffering his mind was sometimes wandering to such an extent that he imagined or said "negroes and snakes were after him." This is clearly proven. Nevertheless it is shown to our entire satisfaction that he made the statements detailed by George Parks and J. C. Gabbert, and that he did so in such a manner as to excite no suspicion that he was not in full possession of his mental faculties. Other reliable witnesses sustain them fully, testifying to the same and similar statements made by the defendant.

That his reason was unclouded and his memory active and sound on Tuesday after the fatal Saturday is indicated by the testimony of the Rev. Wm. Dinges, who had been called in to give spiritual advice, and who relates the substance of

the conversation occurring between them. All that defendant said in that conversation was both natural and sensible.

Coming down to a later period, however, it is abundantly established that the defendant ceased to act as a reasonable creature awhile before his first trial, and has continued to behave like one of little or no intelligence. Whether this condition is feigned, or the consequence of his wounds, or produced by some hidden disease, cannot be certainly determined; and, furthermore, it is unimportant except so far as it might reflect upon the question of his legal responsibility at the time of the homicide, or affect the punishment to be inflicted.

His counsel and his brother testify that they have never been able to have a connected conversation with him about his defense, though they have often attempted to talk with him. Under the recent statute he was introduced as a witness in his own behalf. While on the stand he made no sensible or responsive answer to any question propounded. When requested by the trial Judge to hold up his hand and be sworn, "he stared indifferently around," and made no response whatever. He "paid no attention" to the oath repeated to him, and, on being asked by his counsel to tell about "the killing of Ova Davis," he "stared vacantly," and said, "I want to smoke." Nothing more satisfactory could be obtained from him by the Court or counsel on either side of the case.

Three physicians were examined by the State, but as none of them claimed to be experts on the subject of insanity, they testified as to that only as other witnesses had done.

Dr. Fowler carefully examined the defendant, and applied such tests as he thought necessary to a correct understanding of his mental condition at the time of the first trial. On the second trial he made a full statement of what he had done and the conclusion he had reached, disclaiming, however, the skill of an expert. Among other things he says: "From what I have seen of him, I don't think he is insane. * * * My opinion is, his present condition is the result of the shots in his head. * * * He has no symptoms of insanity in any of its forms."

The other two physicians seem to have the same opinion, but express it in different language.

Three balls remained in the defendant's head until after his commitment to jail. Two of them were extracted by Dr. Dyer and the other by Dr. Fowler. It required some persuasion to induce him to submit to the necessary operation. The jailer says: "I told him he would never do any good so long as the balls were in there, and he said the doctors wanted to take the balls out of his head so he would get well, and then he would be hung." After Dr. Dyer had taken two of them out and Dr. Fowler had called to extract the third one, the defendant refused to permit it to be done. Before that time he had some ap-

pearance of being insane, and had attracted some attention by his peculiar and unnatural conduct.

John Broswell, assistant jailer, says that he and one of the defendant's attorneys exerted themselves to induce him to let Dr. Fowler take the ball out, and that finally the attorney said to defendant that "he could never clear him in the world unless he had the ball taken out of his head; that no jury would ever clear him; that they would always think the ball in his head was what was making him insane." The witness continues: "And I told him the attorney was right about it, and he immediately came out [and] allowed Dr. Fowler to take the ball out."

Evidently the defendant had some reasoning powers left, and some appreciation of his situation before the law as well, when these things occurred.

Such, in substance, is the case disclosed in the record before us. We have examined it with the greatest care and anxiety to learn the truth and administer the law in its fullest humanity and integrity. The defendant had a fair trial by a fair and impartial jury of his countrymen, to whose verdict is added the weight of the approval of the able and humane trial Judge. In our opinion the evidence sustains the verdict and warrants the judgment pronounced thereon.

In any view of the testimony, the defendant was, at most, only periodically insane. His mother and his brothers do not claim more than that; they say that he had "foolish spells," and at such

times did not know right from wrong—nothing more. His general condition they concede to have been that of sanity. To bring the murder within the period of mental unsoundness, and thereby place the defendant beyond the range of legal accountability, it is said that he was "sick and looked bad," and "complained of his head" all the week before; that he "looked wild out of his eyes," and is not thought to have known "right from wrong that morning." No fact, other than his strange appearance and his liability to "foolish spells," is mentioned by his mother or brothers to justify their belief that he was then insane. But, if it were admitted that he was temporarily insane when he parted from them that morning, it would not follow that he was so when he committed the deed two hours later.

It is true that in a question of established sanity or insanity the law presumes the person to continue in that mental state in which he is shown last to have been. 2 Best Evi. (Morgan's Ed.), Sec. 405 and Note 1; 1 Jarman on Wills (by R. & T.), p. 108, note; 6 Heis., 587; 6 Cold., 28; *Overall* v. *State*, 15 Lea, 672.

The trial Judge so instructed the jury.

In our view of the facts of this case, however, that presumption is against the claim of insanity and in favor of that of sanity at the time the deed was done, for the defendant seems to have been sane after he left home that morning and before the homicide. Stover and Martin say that

his appearance, demeanor, and conversation were those of a sane man when they saw him in the meantime; and they not only give such as their opinion, but in support of it they narrate facts and circumstances which seem sufficient to lead others to the same conclusion. In all probability he was then actually on his way to the place of the crime. At any rate he is not shown to have been seen by any one else after that until he was seen by the deceased herself.

However, our conclusion that the verdict is right is not based alone, or mainly, on that presumption. The other facts and circumstances convince us that the defendant was legally responsible for his acts when he took the young lady's life. His own history of the transaction, from first to last, is almost, if not quite, sufficient to produce this conviction. For some time he had been seeking "a chance" to commit the crime. When he discovered that her father and mother were from home he thought that was "his time," and promptly availed himself of it. He says that, while in the field pulling grass for his horse, he saw them leaving that morning. Stover says that after they passed his house, going still farther away, defendant came and asked who they were, and on being informed that they were Mr. and Mrs. Davis, said he thought so, and soon went back into the field to pull grass, as he frequently did. No doubt this inquiry was made to make assurance doubly sure, and with a view of improving the opportunity

afforded. He had heard the young lady was soon to marry another, and preferred to kill her and himself rather than see that occur. Here are motive, deliberation, and caution such as are not evinced by persons irresponsible before the law.

It cannot be that the defendant was impelled by an uncontrollable emotion or impulse, else he would have executed his purpose sooner; if such had been his mental state his heart would not have "failed him" at the spring the week before, because "she looked so nice" and "sang so pretty;" he would not have been deterred the day before by the mere presence of her young sister; and on the very morning he would not have waited to see her parents leave home and sought confirmation of what he thought he saw before making the deadly assault upon her. None of these would have impressed him or restrained him from putting forth an effort which he could not resist. Such an impulse or emotion would have spent itself without so much shrinking, so much caution, so much reasoning and watching for an opportune moment.

Again, the defendant manifestly had some of his reasoning powers about him, and coolness of purpose in a high degree as well, when he thought to turn the body of his victim and trace with accuracy the course of his bullet, to convince himself that the wound inflicted was necessarily fatal before discharging other shots into his own head. And it must have been the continuing presence of mental

vigor that told him to unload and reload his pistol when it refused to fire.

Furthermore, his vivid recollection and graphic description of the homicide with minuteness and circumstantiality, after its perpetration, can hardly be explained upon any other hypothesis than that of sound mind and memory when the deed was done, as well as when described.

The criticism of counsel on the charge of the Court and certain preliminary steps in the prosecution is unavailing. There is no reversible error in any of these. We mention the most important one of the number—if in immaterial matters one can be more important than the others: The minutes of the Court recite that "C. J. Davis" was appointed foreman of the grand jury, while the indorsement, "A true bill," on the back of the indictment, is signed "J. C. Davis, foreman of the grand jury;" the difference being that in the initials of the name the C. is placed before the J. in one instance and after it in the other. How this occurred, or whether the same or different persons are meant, is not explained. In fact, the question was not brought to the attention of the trial Court at all. In the absence of some affirmative showing that the person appointed and the person acting as foreman were different, and the question being raised here for the first time, this Court will presume that the person was the same in each case, and that the transposition of the initials was but a clerical error.

Finally, the affidavit used on the motion for a new trial develops no new fact relating in any degree to the condition of defendant's mind *at the time of the deed;* it relates alone to facts supposed to illustrate his condition *at the time of the trial and after conviction.* Hence, it presents no ground on which a new trial should have been granted.

Had it been desired to urge and show that he was irresponsible at the time of the trial, a plea of present insanity should have been filed in his behalf, as prescribed by the statute, Code (M. & V.), § 2065. *Dove* v. *State,* 3 Heis., 374. The benefit of the statute can be had only under plea of present insanity, and not under plea of not guilty. *Firby* v. *State,* 3 Bax., 358.

Let the judgment be affirmed.