UNITED STATES, Appellee

v.

HERBERT WASHINGTON, Private First Class,
U. S. Army, Appellant

6 USCMA 114, 19 CMR 240

115

No. 3451

Decided July 1, 1955

*Lieutenant Colonel James C. Hamilton* argued the cause for Appellant, Accused.

*First Lieutenant Elliott H. Eisman* argued the cause for Appellee, United States. With him on the brief were *Lieutenant Colonel William R. Ward* and *Lieutenant Colonel Thomas J. Newton.*

## Opinion of the Court

PAUL W. BROSMAN, Judge:

The accused, Washington, was tried by a general court-martial convened at Bamberg, Germany, under a charge of premeditated murder, in violation of the Uniform Code of Military Justice,

Article 118, 50 USC § 712. He was found guilty as charged and sentenced to be put to death. The convening authority approved, and a board of review in the office of The Judge Advocate General, United States Army, affirmed the findings. However, this latter agency, on July 20, 1953, affirmed a sentence which provided for imprisonment at hard labor for life instead of the death penalty.

Washington was informed of the decision of the board of review on August 10, 1953, and signed an acknowledgment of receipt. On the same day he was served with a copy of a certificate which had been filed in this Court, pursuant to the provisions of Article 67(b)(2), Uniform Code of Military Justice, 50 USC § 654. By means of his certificate, The Judge Advocate General sought our determination of the correctness of the action taken by the board of review with respect to the sentence. A copy of the certificate was also served on appellate defense counsel, who had represented the accused before the board, and who, on August 4, 1953, by direction of The Judge Advocate General had been designated by the Chief of the Defense Appellate Division in the former's office to represent the accused before this Court. Briefs from both appellate defense and Government counsel were filed on the issues certified. However, on September 18, 1953—and while the matter was pending before us—defense counsel moved for a stay of proceedings in the cause, "except as to the certified questions," until such time as a final determination of accused's mental capacity to file a petition for grant of review had been made. The effect of the accused's present mental condition on the course of appellate proceedings is the problem with which we must deal in this case.

## II

Prior to his trial by court-martial, the accused was examined by a sanity board. The members of this body concluded that he had been able to distinguish right from wrong, and to adhere to the right, at the time of the crime, and that he possessed capacity to cooperate in his own defense. Doubtless because of this report, defense counsel did not choose to raise the question of sanity at the *nisi prius* level—either as to total or partial responsibility for the offense, or as to mental capacity to stand trial. It is to be noted, however, that the record of trial contains distinct indications that the act of the accused in killing a fellow soldier did not arise out of a commonplace framework of motivation.

It appears that the homicide resulted from Washington's belief that his victim had been one of a group which he fancied had been applying derogatory epithets to him. There are more than intimations that these feelings were quite without factual foundation. Other substantial evidence of the accused's mentally and emotionally disturbed state at the time of the killing is also present. In fact, the showing of such a disturbance served to persuade the board of review to substitute for the death sentence one running to life imprisonment only. However, its members made no specific determination in the matter of the accused's sanity, since the question had not been raised at the trial, or during the proceedings before the board itself.

At about the time the case was pending on appeal before the board—but without knowledge on the part of appellate defense counsel—the accused began the manifestation of pronounced symptoms of mental disease. On July 27, 1953—only seven days after publication of the board's decision—a psychiatric examiner at the Disciplinary Barracks at Fort Leavenworth, Kansas, found that the accused's content of thinking was disorganized, and that he appeared to be approaching a psychotic breakdown. In August it was decided medically that Washington was "suffering from an acute psychotic reaction and he was transferred to Fitzsimons Army Hospital for further observation and treatment." A sanity board convened at the latter facility reported in November 1953 that the accused was then characterized by a "schizophrenic reaction, paranoid type, chronic, severe, manifested by a flattening and inappropriateness of affect, ideas of reference,·

**117**

negativism and marked impairment of insight and judgment." This board recommended retention of the prisoner for further treatment, noted that the issue of sanity had not been raised at the trial, but also expressed the view that the accused was mentally responsible at the time of the offense and had possessed capacity to stand trial.

Still another medical board convened at Fitzsimons reported in April 1954 on the accused's mental status. The same diagnosis was made, and his condition was recorded as "unimproved." This further board recommended that, "In view of this prisoner's psychosis, the remainder of the sentence to confinement be remitted and that he be transferred to a State Hospital." In this connection it was commented "That this prisoner is potentially dangerous to himself and others and cannot be released to his own care or to the custody of his family," and "That in all likelihood, three (3) attendants will be required to accompany this prisoner to his destination at time of disposition from this hospital." This board appears to have concurred in the findings of the earlier one to the effect that the accused had possessed mental responsibility and capacity at the time of the commission of the offense and at that of trial respectively.

### III

It has been suggested forcefully that insanity on the part of an accused person arising during the appellate process ousts the *jurisdiction* of this Court and of other tribunals to conclude review. This contention we must reject. To be sure, there can be found no explicit warrant for our position in the language of either the Code or the current Manual for Courts-Martial. Neither, however, can there be discerned sanction for the opposite interpretation. The explanation for this legislative silence must lie in a simple failure of the draftsmen of the Code and the Manual to consider the problem.

In the Uniform Code of Military Justice, sanity is mentioned directly only with respect to trial proceedings, and not at all in connection with post-trial review. See Articles 51 and 52, 50 USC §§ 626 and 627. Paragraph 121 of the 1951 Manual is entitled "Inquiry before Trial"—and therefore, on its face, would appear to be inapplicable to mental disease first appearing during the appellate process, and not present either at the time of the crime or that of the trial. However, this same Manual division is referenced in paragraph 124, which is concerned with the post-trial action of the convening, or of higher, authority. This mention we construe to be directed to insuring that, in a proper case, the convening authority will direct the convention of a medical board of inquiry—as provided in paragraph 121—for the purpose of answering three questions concerning the accused's mental condition. The first two of these have to do with mental *responsibility* for the crime; the third concerns mental *capacity* and is phrased as follows: "Does the accused possess sufficient mental capacity to understand the nature of the proceedings against him and intelligently to conduct or cooperate in his defense (120c)?" The cross-reference to paragraph 120c is especially significant, for the reason that the latter section of the Manual is headed "Mental capacity *at time of trial.*" (Emphasis supplied.)

It has been recognized judicially that insanity which arises after trial may properly be dealt with in a manner different from that followed in the case of mental disease which precedes verdict and sentence. Solesbee v. Balkcom, 339 US 9, 94 L ed 604, 70 S Ct 457. At the same time, it is clear that the common law prohibits the execution of the death sentence on an insane person—and virtually every Anglo-American jurisdiction subscribes to this view. See Nobles v. State of Georgia, 168 US 398, 42 L ed 515, 18 S Ct 87; Solesbee v. Balkcom, supra. Indeed, an outright authorization to execute in such a case might well infringe due process. Cf. Phyle v. Duffy, 334 US 431, 92 L ed 1494, 68 S Ct 1131; Solesbee v. Balkcom, supra.

In this connection our attention has

been directed to Article 71 of the Code, 50 USC § 658, which purportedly prohibits the suspension of a death sentence by the President. It has been suggested that this provision signifies that the President is without power to suspend the execution of a death sentence until such time as an accused, who has become insane, recovers his reason. From this premise it is argued that the lot of the present accused would indeed be unhappy if this Court were to complete appellate review—and that he might then be executed willy-nilly, for the reason that the President will not be held to possess authority to suspend execution of the sentence for the purpose of awaiting a return to sanity.

This line of approach seems to us to be of little value. The President, in such a dilemma, would often, we assume, commute to life imprisonment—as undeniably he has the power to do. In any event, we do not accept the notion that Article 71 is in any way relevant to a determination of the problem with which we are faced in the present case. The prohibition against the suspension of a death sentence by the President was, we entertain no doubt, directed toward a stay conditioned, say, on the accused's good behavior, rehabilitation, or the like—rather than to one designed to effectuate the long-entrenched legal mandate that an insane prisoner shall not be put to death. Moreover, if an effort were made to hang an insane accused person—regardless of the time of origin of the mental disorder—we would suppose that a motion for appropriate relief would lie to this Court. In short, we are convinced that we were entrusted by Congress with authority to see to it that a proper inquiry is made following any reasonable suggestion of insanity—and certainly before a convict may be put to death. Thus, Article 71 has nothing to do with the problem at hand.

Are there additional reasons—other rights of an accused—which require a holding that this Court is wanting in jurisdiction to complete appellate review? As a matter of fact, in many instances such a holding would redound to the accused's harm. Were we to assume jurisdiction and review the record, is it not possible that we might discover error which would necessitate a rehearing or the dismissal of charges? Moreover, an indefinite continuance of an accused's uncertainty concerning the disposition of his case might well hinder his return to reason.

Pretermitting these possibilities, however, we can perceive no substantial right of an accused, such as Washington, which could not be accorded adequate protection if appellate processes were permitted to continue—with perhaps the provision of special safeguards. For the most part appellate review is limited to the contents of the record, and these are wholly beyond the accused's control once the trial has terminated. Of course, supplementary information may permissibly be furnished by him to a limited extent. Thus, if his insanity preceded action by the convening authority, the accused's lawyers might properly seek to bring out new matter addressed to the discretion of the latter. See United States v. Massey, 5 USCMA 514, 18 CMR 138; United States v. Pratts-Luciano [CM 370895], 15 CMR 481.

There is also the possibility of a petition for new trial—which relies on facts not disclosed at the court-martial hearing. If, however, the application is predicated on information possessed by the accused at the time of trial, almost certainly he will encounter the objection —a virtually insuperable one—that his petition is barred by want of due diligence. Manual, paragraph 109d(2); United States v. Blau, 5 USCMA 232, 17 CMR 232. And, if this information was not within the accused's ken prior to trial, it will not as a usual thing be discovered by him *personally* thereafter —at least if, as here, he has been placed in confinement. Consequently, we are sure that, realistically considered, his interest in the development of matters not raised at the trial can be the subject of proper protection by means of the assignment—as soon as feasible after recognition of insanity—of compe-

tent counsel to effect an on-the-spot post-trial investigation in the accused's behalf. Moreover, we should incline to think that—since matters of fact, rather than those of law, are the chief concern in a petition for new trial—an accused person is entitled to a reasonable time within which to submit such a petition to the Judge Advocate General of the appropriate service after the recovery of his mental health. Cf. State v. Howard, 223 Ind 694, 64 NE2d 25; Cook v. State, 231 Ind 695, 97 NE2d 625.

Concerning the presentation of legal *arguments,* it can be stated—again with realism—that, in light of the experience of this and other courts, but few *sane* accused persons desire to argue their own cases on appeal. Too, and more important, practically no convicted accused—be he sane or the reverse—is able to make any sort of helpful contribution to the preparation of the *legal* contentions to be relied on during an appeal. Thus—unlike that applicable during the trial phase—there is no requirement that an accused be present during the argument of his appeal.[1]

Perhaps his most useful function in connection with an appellate hearing lies in the selection of counsel to represent him. However—with all deference to the right of choice by an accused person —we entertain no slightest doubt that his real interests—as distinguished from empty theoretical ones—may be preserved fully through the appointment by this Court of special counsel to represent him before it. And the same is generally true of proceedings at the board of review level, in case the insanity preceded the rendering of that tribunal's opinion. To dispel all doubt, we would suppose that, in this Court, the assigned special counsel should be a distinguished civilian attorney, a member of its Bar, who would cooperate with the accused's military appellate defense counsel.

It is unnecessary at this time to proceed further in detailing appropriate procedures which would serve to safeguard the substantial appellate rights of an insane accused. Honestly and realistically examined, it is submitted that the protection received by such a person under these proposals is likely to receive substantially more effective representation than that enjoyed by most sane appellants. Moreover, if appellate review is to be completed in the instance of an insane accused, and if he becomes a sentenced prisoner, he will suffer in no way with respect to confinement. Federal legislation clearly provides that a mentally disordered prisoner held by the Bureau of Prisons will be transferred to a place where appropriate psychiatric treatment is available. 18 USC §§ 4241–2. The Armed Forces have similar rules. Additionally, it may be pointed out that a convicted accused is credited with service of confinement from the date the sentence is adjudged. Uniform Code, Article 57(*b*), 50 USC § 638.

In passing, we should note, too, that substantial injustices and inconveniences might well result from a holding that we are powerless to complete the review of a case involving a convicted accused who has become insane. For instance, his conviction could then never become final within the meaning of Article 44(*b*) of the Uniform Code, 50 USC § 619. Thus, while forfeitures might be deducted from his pay, in accordance with the approved sentence of the court-martial, the accused—or, more realistically within the present context, his relatives—would seem entitled ultimately to payment of the amounts forfeited, provided the accused were discharged administratively while insane, or died before recovering mental health. Cf. Manual for Courts-Martial,

---

[1] The insignificance attached to consultation between appellate defense counsel and his client is revealed vividly in the following comment of a Federal Court of Appeals concerning the conviction of certain accused persons by court-martial in a capital case: "Furthermore, since the review of a conviction by court-martial is limited to a consideration of the trial record, *it was unnecessary for appellate defense counsel to interview petitioners.*" Suttles v. Davis, 215 F2d 760, 762 (CA 10th Cir). (Emphasis supplied.)

United States, 1951, U. S. Army 1954 Cumulative Pocket Part, Appendix 15c, page 265; 33 Comp Gen 195. This enrichment of one who has been found guilty by a court-martial is hardly desirable.[2] Moreover, so long as appellate review is uncompleted, the accused will remain an unsentenced prisoner. In particular cases this may have effect in determining the place in which he will be held in custody, or on his opportunities for clemency consideration.

## IV

Turning more directly to the civilian authorities in point, we discover that they, too, support the jurisdiction of this Court. Of course, we need not concern ourselves with the innumerable cases which reiterate the view that an accused shall not be tried, sentenced, or put to death while in an insane condition. Our opinion is in complete accord with these precedents—but they simply do not bear in any direct way on the question of whether appellate processes shall be permitted to continue during an accused's insanity. Also, probably immaterial here is the general statement, often seen, that an insane person may not "after judgment, undergo punishment." Presumably this pronouncement is also directed to the proposition that the death sentence shall not be executed in the case of an insane convict. If such a dictum were intended to embrace more than this, then it would continue to be of no weight here—for the reason that it would conflict with specific legislation opposed thereto in effect.

In this connection, we advert to 18 USC §§ 4241–8, by which special provision is made in Federal penal and correctional institutions for prisoners who are diagnosed as mental cases. Under that enactment, a board is required to examine any inmate alleged to be insane, of unsound mind, or otherwise defective mentally. If the board finds the allegation of deficiency to be correct, the prisoner is transferred to a "hospital for defective delinquents or to any other institution authorized by law to receive insane persons charged with or convicted of offenses against the United States." However, it does not appear that this transfer serves to interrupt the sentence in any degree—for, according to the statute's § 4241, the prisoner continues to remain within the control of the special institution until he shall "be restored to sanity or health or until the maximum sentence, without deduction for good time or commutation of sentence, shall have been served." Compare Uniform Code, Article 57(b). In short, and despite his insanity, the accused in such a situation is deemed to be engaged in serving his sentence—albeit in a penal locale somewhat different from that contemplated originally. At the expiration of the sentence, the accused is disposed of through other procedures. See 18 USC §§ 4243, 4247–8. Rather clearly the assumption of this legislation is that the accused is held under the penal authority of the original judgment, and is undergoing punishment for his crime—and there is no sort of presupposition that the judgment against him by reason of his conviction is suspended because of his insanity or other mental defect. It follows that the validity of this judgment must be determined—for the reason that an accused should not be held under authority of a decree which may possibly be erroneous.

Of course, the original conviction and sentence may become the subject of challenge because of the possibility that the accused was in fact mentally incom-

---

[2] It has been suggested that little faith can be placed in this fiscal argument for the reason that if, on completion of review, error is discovered which requires the direction of a rehearing, the situation is unimproved, since the accused is, by definition, presently insane and not amenable to trial.

It seems to two of us, at least, that this position is not well taken, because the requirement of a rehearing constitutes only one of several possible dispositions of such a case, if appellate review is to be continued here. For example the findings of guilty may be affirmed—or, indeed, the charges dismissed. And, of course, the likelihood of an administrative separation following the disclosure of rehearing-type error is always present. Too, the accused will in many instances regain his sanity and once more become subject to trial.

121

petent when the offense was committed, although the incompetency was undisclosed at the time of trial. A method for dealing with this contingency is furnished by 18 USC § 4245. And it may be significant that—throughout the entire course of this detailed legislation, which deals generally with mental defection—no provision whatever is to be found covering a situation in which mental incompetency intervened during the course of an accused's appeal, but had not been present at the time of trial. Presumably in that circumstance it was intended that the judgment remain intact.

Moving to the civilian case law, we find substantial support for the position that insanity does *not* deprive this Court of jurisdiction to complete appellate processes. In Johnson v. State, 98 Ark 131, 133 SW 596, the Supreme Court of Arkansas considered the appeal of an accused person who had been convicted of murder and sentenced to death. His defense of insanity had been rejected by the jury which returned the murder verdict. However, subsequent to the judgment of conviction, defense counsel—presumably the court-appointed attorneys who had represented him at the trial—informally suggested that, since his conviction, the defendant had been pronounced insane by a county physician and removed from his place of confinement to the county hospital. The truth of this statement was conceded by the Attorney General. The court commented as follows: "That, however, does not affect the adjudication of this court affirming the judgment of the trial court where no error is found in the record of the trial. . . . There is no provision in the statute for suspending proceedings in this court on account of appellant's insanity, though ample protection is provided in that respect in the lower court." It was emphasized that the accused was in no wise precluded from presenting, by writ of error coram nobis or otherwise, the issue of his insanity at the time of trial. It is clear, however, that the Arkansas Supreme Court deemed his post-trial insanity to be irrelevant to appellate review, since it rejected his

**122**

assignment of trial error and affirmed the judgment of the lower court.

In Green v. State, 88 Tenn 614, 14 SW 430, and 88 Tenn 634, 14 SW 489, the Tennessee Supreme Court also had before it the appeal of a murder defendant. Green—having lost his struggle for a young lady's affections—had slain her and thereafter fired a bullet into his own head. His defense of insanity had not been accepted by the jury. However, the supreme court commented that certain of the testimony introduced at the trial and transcribed into the record on appeal, "together with the very unnatural conduct of the prisoner in our presence pending his trial here," had caused its members of their own motion to investigate his current mental condition. The investigation had resulted in a conclusion that the accused was demented. The court, therefore, recommended to the Governor that Green's sentence to death be commuted to life imprisonment. However, the judgment stood affirmed, and the court appears to have entertained no thought that it wanted jurisdiction to review the record of trial, although the accused was insane when review began.

The Louisiana Supreme Court had before it in State v. Brodes, 156 La 428, 100 So 610, the appeal of a defendant convicted of murder and sentenced to be hanged. The court recognized the presence of three possibilities: (1) that the accused had been insane at the time of trial; (2) that he had been sane at the time of trial, but thereafter had become insane; (3) that he had been sane at both times. The case was remanded for a determination by the lower court with respect to the category into which the case properly fell—with the following instruction: "If it should be found that he was not insane at the time of trial, but became so afterwards, *the conviction should stand,* and he should be committed to one of the asylums for the insane, to remain until his reason is restored, when the penalty of the law may be inflicted, all as the statutes provide." (Emphasis supplied.) It is clear that this instruction is irreconcilable with any premise that jurisdiction to review a case is lacking

if the accused has become insane after trial, but before appellate review is completed.

The appellant in People v. Schmitt, 106 Cal 48, 39 Pac 204, had been convicted of first degree murder, but sentenced to life imprisonment only. The brief of the defense lawyer commented that the appellant's mental state was " 'daily nearing the hopeless shores of idiocy,' " and that he was lying " 'in the county jail of Sutter county, under sentence, a gibbering and demented idiot.' " The California Supreme Court noted that, although this be so, the evidence would not suffice to reverse a judgment otherwise legal. Accordingly, the judgment was affirmed—although the court commented that the accused's conviction and sentence did not exclude him from the state insane asylum, and suggested that executive clemency might also intervene. Nonetheless, its action in affirming the conviction is squarely opposed to any assumption that insanity stays the operation of appellate processes.

In Steen v. State, 82 Okla Cr 141, 167 P2d 375, the Oklahoma Criminal Court of Appeals dealt with the appeal of a defendant who, after conviction of murder, had been sentenced to death. The court referred to the provisions of Oklahoma law requiring investigation into the sanity of one under such a sentence, and recommended that the Governor appoint alienists to observe the defendant prior to his electrocution. However—and significantly—no slightest suggestion was made that the accused's insanity might conceivably affect the jurisdiction of the court to review his record of trial. Accordingly—no error having been found in the record— the judgment of the lower court was affirmed.

In Diamond v. State, 195 Ind 285, 144 NE 250, and Ex parte Chesser, 93 Fla 291, 111 So 720, appellate tribunals were confronted with cases involving the possibility that the accused had become insane after conviction and sentence. In neither instance, however, did the Court so much as intimate that the power to conduct appellate review might have been destroyed by the accused's insanity. Thus, there were left intact the prior opinions by the respective courts by which the convictions and death sentences of Diamond and Chesser had been affirmed.

To be sure, certain Texas tribunals have determined that appellate—like trial—proceedings are stayed by the insanity of the defendant. See e.g., Williams v. State, 135 Tex Cr 585, 124 SW2d 990; Jones v. State, 137 Tex Cr 150, 128 SW2d 815. However, these decisions appear to have been predicated on the construction of a Texas statute. In the absence of some like directive in military law—to which our attention has not been directed—they are no more than mildly apposite here. Consequently, as we interpret the precedents, an accused's insanity constitutes no bar to the review of his case.

V

Although there must be held to be *jurisdiction* to review the record of trial of an insane accused person—like the one before us now—we are sure that an appellate court possesses the broadest sort of discretion in its exercise. In the administration of that discretion, we have, in fact, heretofore granted extensive continuances in this case. In truth, we have thought that it seemed preferable to face, if necessary, the charge of having overprotected the insane accused here than to meet the converse accusation.

This preference has posed a dilemma for the writer of the principal opinion. After all, Washington is indisputably psychotic at the present time—the severity of his disorder being indicated, *inter alia,* by the final sanity board's significant remark respecting the need for three attendants in the event of his transfer from Fitzsimons Army Hospital. It is clear that a psychosis qualifies fully as a "mental defect, disease, or derangement," within the meaning of the Manual's treatment of mental responsibility. United States v. Smith, 5 USCMA 314, 17 CMR 314. The delusions of persecution on the part of the accused reflected in the record appear to be typical, indeed identifying, symp-

toms of the paranoia from which concededly he now suffers. Additionally, testimony at the trial to the effect that Washington "kept to himself," "didn't say nothing to nobody," "just nodded his head," and the like, distinctly suggests the existence of that withdrawal which is symptomatic of the schizophrenia under which all medical witnesses believe him to be laboring now.

Perhaps—indeed probably, as the several medical boards may have reasoned—the accused's cur- rent condition may reduce to no more than an incisive response to confinement, and thus was not present either at the time of the offense or that of trial. However, we do not possess fact-finding authority to pass on this issue in the light of all of the evidence now found in the record of trial. United States v. Smith, supra. This Court is simply not empowered to consider the various factual hypotheses bearing on whether the accused was either totally or partially irresponsible, or whether he was incapable of standing trial.

However, the board of review does possess authority to evaluate the facts —and in this connection to consider evidence presented after, as well as before, completion of the trial. United States v. Burns, 2 USCMA 400, 9 CMR 30. In the Burns case, indeed, we pointed out that in military law "insanity is given a preferred rating," and held that a board of review might properly consider post-trial evidence concerning the accused's mental status in the course of effecting its review of the case. Judge Latimer, writing there for a unanimous Court, said:

". . . If the issue has been fully litigated at the trial level, there is no requirement that the board upset the holding or launch into an independent investigation. However, there is no good reason to refuse to evaluate the evidence which has been procured. In this instance the board of review should have weighed the medical reports acquired after the trial along with the other evidence found in the record."

In the case at bar, a large amount of the material which might be regarded as significant in its bearing on the accused's mental condition at the time of the trial, and of the offense, has at no time been considered either by the court-martial or the board. Of course, this situation is not to be attributed to any sort of error or omission on the part of either—but was wholly due to the fact that the critical evidence was not in existence at the time of their separate actions. This, it should be observed, will not infrequently be found to be the case where mental disease is involved. Of course, all psychiatrists will agree that a diagnosis of a subject's mental condition at time $A$ might have been materially different had the examiner known then of the same subject's actions at a later time designated as $B$. When all is said and done, it would simply be untrue to the spirit of our decision in the Burns case, supra, to brush aside without more post-trial information which seems to possess a high degree of relevance to Washington's mental responsibility and capacity at the time of the offense and the trial respectively.

To be sure, medical boards have made certain findings in this case. However, such a medical body is not a tribunal prescribed by the Uniform Code, and its members are physicians whose duties do not require that degree of familiarity with the legal criteria of responsibility demanded of a law officer, a staff judge advocate, or the member of a board of review. This is said in no slightest disrespect to the profession of medicine, but rather in simple recognition of the fact that, as men of science, they do not purport to practice law. Moreover, substantial clarification of the rules of military law bearing on mental responsibility has been accomplished since the determinations of the medical boards with which we are concerned here. See, e.g., United States v. Smith, supra; United States v. Williams, 5 USCMA 197, 17 CMR 197; United States v. Kunak, 5 USCMA 346, 17 CMR 346.

In a world of less than perfection occasions are not infrequent in which one must choose between alternatives—neither of which appears to be wholly satis-

factory. In view of the inflexible positions of my brothers as reflected in their separate opinions, I am forced to choose between reviewing the Washington case as it now stands, on the one hand—without, be it noted, the benefit of action by a board of review based on all presently available evidence[3]—and, on the other, striking it from our docket and remanding to The Judge Advocate General without completion of appellate review. Given this choice, I must elect, in my discretion, to refuse review. Far better, I say, to follow this latter course —far less subject to misunderstanding and, indeed, to the possibility of serious injustice.

## VI

What, then, is the posture of the Court, as reflected in the three opinions in the case at bar? The Chief Judge and the author of the present opinion are in complete agreement, it appears, on the question of whether appellate review may be completed under the circumstances of this case. We entertain no slightest doubt that power exists, and that, in our discretion, we may proceed with the appellate process in the cause before us. This we conceive to be the law of Washington's case, albeit Judge Latimer holds to the contrary view.

The Chief Judge, however, would complete review instanter, whereas the present writer—for the reasons suggested in preceding paragraphs—is unwilling to do so. Thus, there is no majority of this Court which favors remanding the case to the board of review where findings—by a judicial tribunal with power to determine facts —would be possible with respect to the accused's mental responsibility and his mental capacity when trial was held. There is to be found, however, a majority whose members—although for widely divergent reasons—decline now to complete review of the case of this insane accused. Therefore, the present cause must be ordered stricken from the docket of this Court. This is hardly the disposition the author of the principal opinion would have chosen. It is necessary, however, that two members of this Court join in a single action if its efforts are to come to more than an exercise in legal rhetoric—and the course selected is preferable to its competitor. No further proceedings will be undertaken here until the accused, Washington, regains his sanity.

The record of trial is remanded to The Judge Advocate General, United States Army.

QUINN, Chief Judge (concurring in part):

In my opinion there is no question about the accused's sanity at the time of the offense and at the time he was tried, convicted, and sentenced. He was examined by a board of medical officers a week before the trial, and it was determined that he was legally responsible for his act, and that he had the mental capacity to understand the proceedings against him and to cooperate in his defense. Approximately eight months later, he was examined

---

[3] Under the view of one of us, a board of review possesses authority to reduce a death sentence to one of life imprisonment at any time this course seems appropriate to its members. The writer of the present opinion holds to a different view in the usual death case. However, without expressing any sort of opinion on the issue at this time, he considers unsettled the question of whether this power exists in a case in which the accused has been found by a board of review to be incurably insane. In such an instance it is clear that the insane convict can never be put to death lawfully. Accordingly, it is arguable that there should be no requirement that the President act on a death sentence when it is clear, as a matter of law, that it cannot lawfully be executed. After all, wherever possible military, or other, law should be construed to avoid the empty gesture. From this approach it is at least possible that the action of the present board with respect to the sentence might be supported if the accused were now to be found incurably insane, although—in the writer's view —the action would not have been permissible otherwise. Of course, if a majority had favored remand to the board, its members would have been free to consider such an hypothesis.

by a second medical board. This board reaffirmed the findings. Then in April 1954 he was examined for a third time. The last medical board also reaffirmed the findings.

Deterioration of the accused's mental capacity was first observed after he was served with a copy of the opinion of the board of review affirming his conviction. He then began to engage in "bizarre behavior." He became "suspicious, extremely tense and restless" and "markedly preoccupied." Eventually, it was determined that he was suffering from a schizophrenic reaction, paranoid type. A certificate attached to the second report notes that the accused "is oriented in all spheres and recall of past and recent events is good." A finding of the third board, however, states that the accused is "mentally incompetent to understand the nature of these Board proceedings or to manage his own affairs." It appears, therefore, that accused's mental condition has steadily deteriorated and that he is now unable to adequately understand the nature of the proceedings before this Court. Does that mean that we are without power to complete the appellate process provided by Congress? In my opinion neither law nor logic requires that conclusion.

To hold that this Court is powerless to proceed as a matter of law distorts the humanities which have led to acceptance of the general principle that an insane person shall not be tried, sentenced, or executed. It should, of course, be noted at this point that the present proceeding is not concerned with any of these objectives. The consequences of such a holding are dangerous. Suppose, for example, an accused is tried, convicted, and sentenced on evidence which is entirely insufficient to legally support the conviction. Later, as in the present case, he becomes mentally unsound. Should the boy's parents, relatives, or next friend be prohibited from engaging counsel in his behalf to petition this Court to review and reverse the conviction, and to restore the accused to all rights, privileges and benefits of which he was deprived by virtue of the conviction? Certainly not.

**126**

It is plain that Congress did not intend to deprive this Court of the power to proceed under such circumstances. If the Court could proceed in that instance, it can also, in its discretion, proceed in the present case.

Justice both to the Government and the accused requires that this appeal be completed. If the conviction cannot legally be sustained, fairness to the accused requires that it be set aside, and that he be restored to all rights and privileges of which he may be deprived by reason of the sentence of the court-martial. On the other hand, if the conviction is legally correct, the Government should have the right to proceed to the point of finality. See Article 44 (b), Uniform Code of Military Justice, 50 USC § 619. If it is deprived of that right, the accused may be inordinately enriched in financial and other benefits at the expense of the people. See Manual for Courts-Martial, United States, 1951, U. S. Army 1954 Cumulative Pocket Part, Appendix 15e, page 265. Cf. 33 Comp Gen 195. This result is neither desirable nor compatible with common sense.

I fully recognize the right of an accused to select counsel of his own choice to represent him on appeal. An insane person cannot, of course, exercise a free choice, but then neither can an indigent accused. On pleading impecuniousness, the latter has no absolute right to select counsel from among the members of the bar. Instead, the court will appoint competent counsel for him, regardless of the accused's individual preference. So on this appeal, if a parent, relative, or next friend of the accused does not initiate an effort to obtain individual counsel for the accused, the procedure provided by Congress for the appointment of military counsel is available. In addition, as pointed out by Judge Brosman, this Court can designate one of the members of its Bar to collaborate with military counsel to represent the accused. Certainly, as far as this case is concerned, the accused, when concededly sane, and during all of the proceedings already had, apparently was satisfied with his appointed military counsel. In fact, it was military counsel

who represented him before the board of review and who filed the present suggestion of insanity. Hence, the general principle that an accused is entitled to counsel of his own choice is no real or substantial obstacle to the conclusion of the proceedings before this Court.

This Court acts only with respect to matters of law. And its consideration of the case is confined exclusively to the record, which is itself unalterable. Consequently, none of the standard reasons for staying proceedings against an insane person are applicable here. Except upon petition for a new trial, which is an entirely separate proceeding, no new matter can be presented by an accused which would affect our consideration of the record. And as far as protecting the rights of the accused is concerned, this Court has never limited itself to assignments of error raised by the accused; rather it has always independently searched the record for possible prejudicial error.

The question of executing an insane person is not before us. Completion of review of the record by this Court is for the purpose of determining the legality of the accused's conviction. That purpose does not embrace the execution of an insane person. I am sure the Executive Department will not permit the execution of an insane man.

Finally, the opinions of my brothers suggest that this Court might be required to reinstate the death sentence if it undertook to review the case. I disagree with that conclusion. In my opinion, a board of review has power under the Uniform Code of Military Justice, to reduce a death sentence to confinement for life. See my dissent in United States v. Goodwin, 5 USCMA 647, 18 CMR 271. And I do not imply that a board of review has the power to *commute*, which power, in my opinion, properly rests in the Executive and not in the Judicial branch of the Government. However, I need not now elaborate on my reasons for that view. Suffice it to note simply my objection to their intimation. I would, therefore, appoint a civilian member of the Bar of this Court to act in conjunction with appointed military counsel for the accused, and direct that this case proceed to completion.

LATIMER, Judge (concurring in the result):

This cause reached this Court on the simple issue of whether appellate proceedings should be stayed ▪ because of the insanity of the accused or whether we have the authority to adjudicate the certified questions and the merits of the appeal. The Chief Judge concludes the matter should proceed in the ordinary course, while the writer reaches a contrary conclusion. Judge Brosman, sensing disaster ahead if we proceed, elected to divide his attention. He joins the Chief Judge in saying we can continue to the end, but he prefers not to. Accordingly, he joins me in result, but conceptually he is far removed from both his associates. In the end, the only rule of law established by the Court is that insanity after findings and sentence does not stay appellate processes, and to that issue I devote the major portion of my opinion. I will, however, mention why I refused to join Judge Brosman in his result which primarily seeks a rehearing.

His basic premise is that we have discretion to decide or not to decide. I disagree. Every accused, who appeals, is entitled, as a matter of right to have his case decided, unless we are prohibited by law from exercising jurisdiction. We cannot tell a sane person that we exercise our discretion not to decide his case; and if the rights of this accused are to be measured by the standards of an ordinary appellant, then he is entitled to the benefits of a final adjudication. If he falls in a preferred class, it is because the law says, as I read it, that a court cannot adjudicate a person's rights while he is insane. If, as my good associate states, there might be prejudicial error in the record and this accused might be entitled to the benefits of reversal, why is he not entitled to a determination of that possibility? I did not understand we could be so selective. Obviously, the answer must be that he might be prejudiced. However, if the power to decide exists,

**127**

it must be exercised, whether it is beneficial or harmful to an accused. It is a strange concept indeed that we can look at a record and, by measuring its impact on an accused, determine whether we will decide his fate. The net result of that holding is painfully apparent in this instance. Because Judge Brosman has his own psychiatric evaluation of the accused, which is contrary to every bit of medical testimony in the record, and prefers to afford him an opportunity to try the issue at the trial level—an unjustifiable largesse, opposed by both the Chief Judge and myself, and, so far as I know, a concept hostile to appellate proceedings—he joins me in staying proceedings. I suppose it is fair to state that implicit in that view is a belief that our will to proceed is determined by our individual conclusions of ʻguilt or innocence.

Both the Chief Judge and Judge Brosman mention, as an argument in favor of proceeding, the contingency of cost to the Federal Government. That is a poor makeweight to support their arguments. A soldier's life should not be weighed against monetary considerations, and if Judge Brosman's views are closely analyzed, it will become apparent that he argues against himself. If a rehearing was granted, this accused could not be retired so long as he remains insane. Every authority is to that effect. The accused would, therefore, stand unconvicted, and he would be entitled to every benefit running to an enlisted man. I wonder if the cost would be decreased in that event. Be that as it may, this man became insane while he was a member of the Army and unless he is executed, an impossibility unless his sanity is restored, he must be cared for at public expense. The rights of his dependents, if any, should be determined by another, and proper, tribunal.

My associates seem to express a paternalistic attitude toward this accused. They assert the President can prevent his execution by commuting a death sentence if reimposed. They can extend his time to petition for new trial, they can select him the finest counsel, and they are willing to protect his every substantial right, except one. That one

being his right not to have his life or freedom forfeited while he is in such a mental condition that he knows not what is being done to him and cannot assist in protecting the most valuable possessions he enjoys. The plain unvarnished truth is that if we were to proceed, the probabilities are that this accused would have a death sentence reimposed on him while he is insane. I pose, but do not answer, this question. Assuming this case is returned to a board of review, can a factual determination be made while an accused is insane? Using my solution we would never reach that question, nor the many other doubtful ones which are raised for those who must grapple with the rule of law announced by the majority.

One further matter bears mentioning before I set forth my affirmative views on why all proceedings should be frozen in their present status. This accused committed a heinous offense. He has had his day in the trial court and before the board of review concerning his responsibility for the crime. He was examined prior to trial and the psychiatrists were unanimous in their conclusion that he was sane at the time he committed the offense and at the time he was tried. Since being incarcerated he has been under almost constant observation by mental experts. Unanimity on his sanity on both those occasions is presented by this record. The very experts who assert he is now insane all agree that he was not so prior to and when he was tried. I do not pit my beliefs against theirs and I am certain they gave consideration to the progression of his mental disease. They ought to be able to fix his rate of decline better than I, and I prefer to accept their judgment. They, too, were informed of any bizarre conduct on his part and I have no reason to suspect that they did not weigh it in arriving at their conclusions. Accordingly, there just is no issue of mental responsibility posed by this record. Based on what is before us, the accused is not entitled to freedom from conviction via a rehearing and neither should appellate review be undertaken while he is insane. Both parties are entitled to justice at our hands and

neither should be prejudiced on the merits by after-acquired insanity. The only way I can find which does that is to stop all proceedings where they are, and if sanity is later restored, then to pick up and continue on. In that way a condition over which neither party has control does not legally work to the detriment of either. To do otherwise is bound to prejudice either the Government or the accused, and possibly both.

As the starting point for my discussion of the effect of intervening insanity on judicial proceedings, I shall turn back to the common law. The humanities of that time decreed that one who was sane at the time of the offense, but who later became insane before or during the trial, could not be tried at that time and the proceedings had to be suspended until his mental capacity had been restored. In Reg v. Berry, 1 QB Div 447, the following principle was announced:

"Further, I believe it to have been the law from the earliest times that if it be found, at the trial of a prisoner, that he cannot understand the proceedings, the judge ought to discharge the jury and put an end to the trial, or order a verdict of not guilty. The jury here have found the prisoner incapable of understanding, and it needs no argument to show that under such circumstances he ought not to be convicted."

The substance of that rule is confirmed in a quotation found in 44 CJS, Insane Persons, § 127, page 283. There I find the following language:

"At common law, and in some jurisdictions by express statutory provision, if a person becomes insane after the commission of a crime, he cannot be required to plead or be tried while he is in such condition. So, also, if accused becomes insane during the trial, the proceeding must stop. Such insanity, however, does not abate or otherwise dispose of the prosecution, except to delay it, and accused may be tried if he afterward becomes sane again."

In those jurisdictions which have en-acted statutes, the enactments, generally, do no more than restate the common-law rule. In State v. Helm, 69 Ark 167, 61 SW 915, the court stated:

"The intention of the statutes of this state and of New York is the same. What was said of the New York statute in Freeman v. People can be truthfully said of the statute of this state. The statutes of both states, so far as they severally extend, are enactments of the common-law rule which forbids the trial of any person, or the pronouncement of judgment against him, while he is in a state of insanity. The reason of the rule for prohibiting the trial while he is insane is the incapacity of one who is insane to make a rational defense, and for prohibiting the pronouncement of judgment against him while he is insane is, if sane, he might be able to show cause why judgment should not be pronounced against him, but, being insane, though having sufficient cause, he might not make it known."

A similar principle has been announced in the District of Columbia. The United States Court of Appeals for the District of Columbia in Haislip v. United States, 129 F2d 53, (1942) stated:

"The lunacy inquiry of July 26, 1939, was for the purpose of determining whether the defendant was then capable of understanding the nature and objects of the proceedings so as properly to conduct his defense. The verdict of insanity spoke as of that date and was a legal determination that appellant was not then mentally qualified to stand trial. When, thereafter, he was restored to sanity, the certificate of the superintendent to that effect removed the previous bar. The sole effect of these sections is, in a proper case, to suspend the criminal proceedings during the period of insanity. The jurisdiction of the court continues, and when sanity is restored the case may proceed as if the interregnum had not occurred. Wagner v. White, 38 App DC 554, 558."

The concepts found in the previously

cited authorities apply at the trial level but they do not pass squarely on the problem now confronting this Court. However, they would preclude a rehearing. In those cases the mental incapacity of the accused occurred at such a time as to render him incapable of presenting evidence and information necessary to enable him and his counsel to present a rational defense, to advance reasons why judgment should not be rendered against him, and to submit facts which would support mitigation of the sentence. In the instant case, no contention is made, except by Judge Brosman, that the accused was not sane at the time of trial and judgment, nor was the issue of insanity raised before the court-martial or the board of review. Thus, I have before me in this instance a complete record of the trial and the intermediate appellate hearing in which the accused participated while he was legally and mentally competent. I am, therefore confronted squarely with the question of whether the rule that intervening insanity stays proceedings should be inclusive enough to bar all unfinished steps in appellate review.

When I pass on from the trial phase to the last step in a criminal proceeding, I find respectable authority to guide me. Again, at common law, if insanity intervened between sentence and execution, the latter was suspended. That principle, as stated in Blackstone's Commentaries, and quoted by the Supreme Court of the United States in the case of Nobles v. State of Georgia, 168 US 398, 42 L ed 515, 18 S Ct 87, is as follows:

" 'Also, if a man in his sound memory commits a capital offense, and before arraignment for it he becomes mad, he ought not to be arraigned for it, because he is not able to plead to it with that advice and caution that he ought. And if, after he has pleaded, the prisoner becomes mad, he shall not be tried; for how can he make his defense? If, after he be tried and found guilty, he loses his senses before judgment, judgment shall not be pronounced; and if, after judgment, he becomes of nonsane memory, execution shall be stayed;

for, peradventure, says the humanity of the English law, had the prisoner been of sound memory, he might have alleged something in stay of judgment or execution.' "

The reasoning used to decide the foregoing cases might be construed either as authority for the converse propositions that we should suspend proceedings entirely or that we should permit the appeal to continue, and let others suspend execution. That contradictory construction follows from the fact that appellate review, as we now know it, did not exist at common law and the early authorities skip the appellate processes between sentence and execution. Interpreted all inclusively, the cases seem to say that all existing judicial proceedings should be suspended by the insanity of a defendant, and that would include each and every divisible step in an appeal. Interpreted narrowly, it can be asserted that they hold only that those judicial proceedings which required the personal presence of the defendant must be stayed. Before expressing my reasons for preferring the more liberal interpretation, I mention briefly one further restriction which appears to be implicit in the early cases. The rule as stated in Blackstone's Commentaries, supra, applied the suspension of execution to cases involving only capital offenses. Apparently in noncapital cases execution was not suspended when the insanity arose after sentence. That general principle is found stated in 24 CJS, Criminal Law, § 1619, on pages 197, 198. There it provides:

"At common law, and also under some statutes, where accused becomes insane after the sentence, *usually for a capital offense,* has been pronounced, its execution should be stayed while he continues in that condition.

. . . . . .

"Unless the matter has been otherwise adjudicated or control assumed by the appellate court by supersedeas or otherwise, the granting of such stay rests largely within the inherent power and discretion of the trial court, or other official authorized to

suspend the execution." [Emphasis supplied.]

Weihofen, in his work on "Mental Disorder as a Criminal Defense," 1954 ed, pages 464–465, has this to say·on that subject:

"The rule applies only to capital cases. The common law made no provision for suspending execution of sentence because of insanity where the punishment was less than death. Modern statutes usually provide that if a convict serving sentence is found by the prison warden to be insane, he may be transferred to a proper hospital or ward for insane criminals."

In Kelley v. State, 157 Ark 48, 247 SW 381, the accused was convicted of second degree murder and sentenced to confinement in the penitentiary. One year after his conviction he filed a petition stating that he had become insane and requesting that the court impanel a jury to inquire into the question of his sanity. He also asked that the execution of the judgment be postponed or suspended and that he be committed to the State Hospital for Nervous Disorders for treatment instead of being sent to the penitentiary. The lower court denied the petition, and the Supreme Court of Arkansas, after quoting the rule as enunciated by Blackstone, stated:

"There is nowhere found a statement of any rule of the common law which would extend relief in a felony case of less degree than a capital offense; the reason evidently being that it is a rule of extreme emergency to prevent the execution of the death penalty on an insane felon."

The principle, limiting the doctrine to capital cases, is not followed generally in Federal jurisdictions. The Circuit Court of Appeals, Sixth Circuit, in Youtsey v. United States, 97 Fed 937 (1899), which involved charges of embezzlement, not a capital offense, employed the use of the broad principle. It stated:

". . . It is fundamental that an insane person can neither plead to an arraignment, be subjected to a trial, or, after trial, receive judgment, or,

after judgment, undergo punishment."

And again in Forthoffer v. Swope, 103 F2d 707 (CA 9th Cir) (1939), the principle that punishment should not be imposed upon an insane convict was applied in a case where accused was charged with assault with a dangerous weapon.

It must be conceded that when dealing only with the execution of a sentence there may be a logical reason for differentiating capital from noncapital cases. In the latter category, in most jurisdictions, the defendant is confined, whether sane or insane, but his place of confinement may be different. Instead of a penitentiary being his place of residence, he might reside in a mental institution. He is effectively denied his freedom in either event and, therefore, the reason for staying execution is not too compelling. If he regains his sanity, he is alive to assert and establish any claim he may have as to why execution of his sentence should be barred. However, in a capital case either the execution is suspended or the defendant is dead. It is then too late for him to come forward with reasons to stay his or the sentence's execution.

I am sure that within the military there are administrative and medical regulations which provide a procedure by which an accused who becomes mentally incapacitated after conviction and sentence can be transferred from his place of incarceration and placed in an institution where proper medical treatment is available. As a matter of fact that was done in this case, since the accused was transferred from the United States Disciplinary Barracks at Fort Leavenworth, Kansas, to Fitzsimons Army Hospital at Denver, Colorado, some time between August 10 and September 10, 1953. However, for reasons peculiar to the military services, particularly with respect to the limitations placed on death sentences, the lack of authority of judicial tribunals to suspend the execution of sentences, and the grant of power to all reviewing authorities to consider originally any issue of insanity, I believe the Federal rule to be the one best suited to·meet the

requirements of military law. I, therefore, conclude that there should be no difference between capital and noncapital cases in applying the rule in the military judicial system that all proceedings should be stayed.

There is a dearth of authority on the refined question of whether appellate proceedings freeze immediately when insanity is established. Generally, the matter is governed by specific statutes in the jurisdiction which prescribe the manner and forum in which the issue may be raised. Cf. Johnson v. State, 97 Ark 131, 133 SW 596; State v. Superior Court, 139 Wash 125, 245 Pac 929; Green v. State, 88 Tenn 634, 14 SW 489; Solesbee v. Balkcom, 339 US 9, 70 S Ct 457, 94 L ed 604. However, there are two jurisdictions which, even though they have statutes governing their particular proceedings, throw some illumination on the problem.

The courts of the State of Texas have adopted the rule that all proceedings, including appellate review, are stayed by intervening insanity. The statute of that state provides as follows:

"Upon the trial of an issue of insanity, if the defendant is found to be insane, all further proceedings in the case against him shall be suspended until he becomes sane."

That provision is strikingly similar to one found in the Manual for Courts-Martial, United States, 1951, *ante*, and it has been held by the Texas courts to relate to proceedings in the appellate court as well as those in the trial court. Williams v. State, 135 Tex Cr 585, 124 SW2d 990; Jones v. State, 137 Tex Cr 150, 128 SW2d 815; and Nugent v. State, 155 Tex Cr 269, 234 SW2d 426. In Williams v. State, supra, the Court of Criminal Appeals of Texas, after quoting the statute and italicizing the phrase "all further proceedings in the case against him," stated as follows:

"It would appear that the italicized language relates to proceedings in this court as well as proceedings in the trial court. We are therefore constrained to grant the motion.

"The motion to suspend further proceedings is granted and the clerk

of this court is directed to retire this cause from the docket until it shall be properly shown to this court that appellant has again been tried and found to be sane."

It can be said discriminately that the language found in People v. Skwirsky, 213 NY 151, 107 NE 47, supports the doctrine of the Texas courts. There I find the principle proclaimed in the following statements:

"These provisions, and others relating to the insanity of defendants in criminal cases, clearly manifest the intention of the Legislature that legal proceedings for the punishment of a person accused of crime shall be suspended while he is mentally deranged. This is probably because an insane defendant is unable to advise his counsel of facts which may be material to his defense upon his trial, or, *in the event of an appeal, to confer with his counsel in reference to the argument thereof;* but whatever may be the reason, the intent is so plain that it ought not to be disregarded." [Emphasis supplied.]

At first glance it may appear that the State of Arkansas is on the other side of the question. The Supreme Court of that State, in Johnson v. State, supra, in a situation similar to the one now before us, stated:

". . . Appellant's counsel have informally suggested to us that since the judgment of conviction was rendered appellant has been pronounced insane by the county physician and removed from the jail to the county hospital. It is conceded by the Attorney General that this is true. That, however, does not affect the adjudication of this court affirming the judgment of the trial court where no error is found in the record of trial. Appellant pleaded insanity as a defense to the crime, but no plea of present insanity was interposed at the trial nor was there any suggestion of present insanity as a reason why judgment should not be pronounced on the verdict of the jury. There is no provision in the statute for suspending proceedings in this court on account of appellant's insanity, though ample

protection is provided in that respect in the lower court."

The decisions from the Texas and New York courts, as previously suggested, seem to be consistent with the provisions of the Manual which are to be the subject of discussion shortly hereafter. However, those from Arkansas are not necessarily in conflict. In the latter state it was not necessary to stay proceedings at the appellate level, as adequate protection after judgment was available to the defendant in the lower court and he was not left without relief. We have no similar proceedings in the military judicial system. We do, of course, have the convening authority who might suspend the execution of some sentences until recovery, but that offers no protection to the appellate rights of an accused and it is ineffective in capital cases. In connection with the latter statement, I direct attention to Article 71 of the Code, 50 USC § 658, which provides:

"(a) No court-martial sentence extending to death or involving a general or flag officer shall be executed until approved by the President. He shall approve the sentence or such part, amount, or commuted form of the sentence as he sees fit, and may suspend the execution of the sentence or any part of the sentence, as approved by him, except the death sentence.

. . . . . .

"(d) All other court-martial sentences, unless suspended, may be ordered executed by the convening authority when approved by him. The convening authority may suspend the execution of any sentence, except a death sentence."

The quoted Article leaves an accused, who is sentenced to death, without recourse if he becomes insane after findings and sentence, unless appellate judicial authorities can delay acting on his case until sanity is restored. I do not believe Congress intended such a result. By way of illustration, suppose in this case we were to continue with the litigation. In view of our holdings in United States v. Bigger, 2 USCMA 297, 8 CMR 97, and United States v. Free-man, 4 USCMA 76, 15 CMR 76, we, in all probability, would be required to reverse the board of review and reinstate the death sentence. If that were affirmed, we would present the President with the problem of either not acting on the record or commuting the sentence. If he approved both, execution would follow as, according to the Code, it cannot be suspended by him. A case should not reach the President in that posture as he should be unfettered in his decision. My associates pay scant heed to this argument, but in so doing they fail to discriminate between refusing to act and suspending a sentence. I surmise a public official is not supposed to put off a decision for years. Certainly, a President does not want to be continually faced with an undecided death case, and he would have no desire to pass it on to a successor. He cannot suspend sentence, he cannot permit the accused to be executed and he has no choice but to commute the penalty, regardless of the appropriateness of the death sentence.

Laying aside the difficulty we would place in the lap of the President by our proceeding with judicial review, an accused's right to an adequate and fair review demands that the cause should be retained in the judicial department. The rationale of all cases is humanitarian in vein, and an insane defendant is not to be left without a remedy in the judicial arena. If he must possess his mentality at the time of trial, sentence, and execution to offer reasons to protect his life or liberty, it is equally important that he have the same mental capacity, so long as judicial proceedings are available, to protect either. During the time of appeal, it is possible he could produce facts which might challenge an affirmance by us. Conceding he must be represented by appointed counsel, he ought to be mentally competent to confer with and assist him in the preparation of an argument on the case, or to employ counsel of his own choosing if he is dissatisfied with the attorney assigned by the Government or by this Court. Furthermore, appointed counsel hesitate to bind their clients without their knowledge and their work is hindered if they do not

**133**

have the benefit of consultation with an accused who is mentally capable of making intelligent decisions. Therefore, unless I find compelling reasons to the contrary spelled out in the Code or the Manual, I am not disposed to adjudicate the appeal of an insane man.

With those views in mind, I turn to military law as it is prescribed for us. Paragraph 124 of the Manual defines the power and authority of convening and higher authorities in regard to this subject:

"After consideration of the record as a whole, if it appears to the convening authority or higher authority that a reasonable doubt exists as to the sanity of the accused, he should disapprove any findings of guilty of the charges and specifications affected by such doubt and take appropriate action with respect to the sentence. Such authority will take the action prescribed in 121 before taking action on the record whenever it appears from the record of trial or otherwise that further inquiry as to the mental condition of the accused is warranted in the interest of justice, regardless of whether any such question was raised at the trial or how it was determined if raised."

Paragraph 121 sets out the procedure to be followed when the sanity of an accused is brought in question. It provides for an examination by a board of medical officers to determine three issues. These are: The accused's ability to distinguish right from wrong at the time of the offense; his ability to adhere to the right at that time; and his capacity to understand the nature of the proceedings against him. The provision then continues:

"To determine these questions the board should place the accused under observation, examine him, and conduct such further investigation as it deems necessary. *On the basis of this report, further action in the case may be suspended,* or the charges may be dismissed by an officer competent to appoint a court-martial appropriate to try the offense charged, or proceedings may be taken to discharge the accused from the service on the grounds of his mental disability, or the charges may be referred for trial. Such additional mental examinations may be directed at any stage of the proceedings as circumstances may require. The officer directing or requesting the mental examination of the accused will attach the report of examination to the charges if referred for trial or forwarded." [Emphasis supplied.]

While the foregoing Manual provision deals principally with the trial phase, it must be interpreted in the light of paragraph 124 which gives all higher authorities the right to take appropriate action by suspending all further action if the accused does not have the mental capacity to understand the nature of the proceedings against him. In this case the only sensible action we can take is to maintain the status quo. Any other interpretation of the Manual provisions would bring about this undesirable result. If a petition was filed originally with us alleging the accused had been rendered mentally incompetent after we had acquired jurisdiction of his appeal, we would be authorized to determine the issue. However, unless we could stay further proceedings, our hearing would be abortive. We could not, in good faith, dismiss the case and we would be left with the alternative of disposing of the appeal in the same manner as if an accused were sane. If that is the most we can do, there would be no reason for granting us the power of determination of the question of insanity. Implicit in the power to determine an issue is the authority to dispose of it effectively.

I have considered the question as if the appeal were presently before us, and while counsel for the accused in these proceedings registered no objection to the Court disposing of the certified questions, I have concluded that the same principles are applicable to them. Assuming, arguendo, that the board of review erred and that we should settle the law as requested by The Judge Advocate General of the Army, the accused has a right to be heard. Under our rules of procedure, one convicted of an

134

offense does not lose the benefits of a favorable board of review decision unless and until it has been argued, decided, and reversed on appeal to this Court. He is entitled to oppose the certified question and he has a legal right to present his arguments to sustain a ruling in his favor. His rights are intertwined so inextricably with those of the Government that a decision is bound to affect his interests. Merely answering a question certified does not end litigation. On the contrary, it may necessitate additional hearings, and if we overturn the ruling of the board of review in this case, we are faced immediately with a mandatory appeal. In a limited sense, a reversal would increase the punishment and at a time when the accused is incompetent. Humanitarian principles argue persuasively against that result. Moreover, we have previously announced a rule that piecemeal reviews are not favorably considered and a ruling on the certificate would be no more than that. While I prefer to process certificates from the respective Judge Advocates General with dispatch and furnish them answers to their questions, we should not do so if, at the same time, we impair the rights of a mental incompetent. I must, therefore, conclude that a continuation of this litigation would deny the accused the rights and benefits available to litigants who are mentally competent.