UNITED STATES, Appellee

v

SALVATORE R. RUSSO, Staff Sergeant,
U. S. Air Force, Appellant

11 USCMA 352, 29 CMR 168

No. 13,565

Decided April 8, 1960

*Lieutenant Colonel Dwight R. Rowland* argued the cause for Appellant, Accused. With him on the brief was *Lieutenant Colonel Philip J. Williamson*.

*Lieutenant Colonel Francis R. Coogan* argued the cause for Appellee, United States.

## Opinion of the Court

HOMER FERGUSON, Judge:

The accused was found guilty[1] of premeditated murder, in violation of Uniform Code of Military Justice, Article 118, 10 USC § 918, and sentenced to forfeit all pay and allowances, and to be put to death. Intermediate appellate authorities affirmed and the case is now before us on mandatory review. Appellant has assigned seven errors, which will be discussed separately. It is necessary, however, initially to outline the facts in some detail.

The accused was assigned to the 340th Transportation Squadron, Whiteman Air Force Base, Missouri. As a result of the rejection by a female acquaintance of his offer of marriage, he conceived the idea of purchasing a pistol and killing someone. He was unable, however, to obtain the weapon. Several weeks later, on July 31, 1958, he was on duty as supervisor of the Tool Room in Building 5–159, located on Whiteman Air Force Base. During the lunch hour, he obtained two bottles of whiskey from a nearby off-post establishment. He drank "a pretty big slug" from one bottle and placed it in his locker. He took the other bottle, a half-pint, with him when he returned to the Tool Room. There, he consumed its contents. He began to brood over the rejection of his proposal of marriage, and "got mad at 'the whole damn world.'" He decided to shoot "someone—anyone." Accused then re-

moved a carbine, kept for alert purposes, from its position on the wall and obtained a clip of ammunition from his desk. He inserted the clip in the carbine and returned the weapon to its place. He intended to shoot the first person who came into the Tool Room. An individual appeared at the door, but the accused, for reasons unknown to himself, made no hostile move toward him. Shortly afterwards, however, Airman Weintraub and Airman Scarbrough appeared at the door in order to return some tools. They were joking with each other. The accused removed the carbine from the wall and pointed it at Weintraub. Weintraub told him not to play with a carbine with a clip in it and simultaneously seized the weapon's barrel and pushed it upward. The gun clicked, and the accused operated its action, stating; "It's loaded." He then pointed the weapon at Weintraub and fired. The victim fell on the floor, and the accused fired again. He was subsequently disarmed by a nearby airman. Weintraub was pronounced dead upon his arrival at the Base Hospital and a subsequent autopsy resulted in the opinion that death resulted from a penetrating heart wound. He also suffered a separate wound in the upper arm.

Several psychiatrists and one psychologist testified at the trial. All were eminently qualified. As is not unusual, those who appeared for the prosecution were of the opinion that the accused

---

[1] ACM 15851.

was mentally responsible, while those who appeared for the defense held the contrary view.

Following complete instructions by the law officer, the court-martial returned findings of guilty and thereafter sentenced the accused to the supreme penalty.

The staff judge advocate carefully reviewed the record of trial and recommended that the convening authority approve the sentence. While that officer took such action, he also "recommended that it [the sentence] be commuted to dishonorable discharge, forfeiture of all pay and allowances, and confinement at hard labor for the term of his natural life."

In its action on the case, the board of review indicated its belief that commutation of accused's death sentence was appropriate. However, it decided that it was "powerless" to effect the change in penalty, as "Congress has not granted that power to Boards of Review." Accordingly, it affirmed the findings of guilty and sentence.

I

The accused initially urges that the trial counsel erred prejudicially by informing the members of the court-martial that the convening authority had directed the charges be treated as capital. The basis for this assignment is found in the following statements in the record:

"TC: Prior to determining whether the prosecution has any challenge for cause, I should like to bring out to you members of the court that this case has been referred to trial with direction that it be treated as a capital case. As such. . . . .

"DC: Just a moment. Request an out-of-court conference with the law officer.

"LO: Counsel for both sides and the accused.

"LO: Let the record reflect that a side-bar conference was held and attended by counsel for both sides, the accused, and the law officer. The proceedings were not recorded and will not be appended to the record.

"LO: Trial counsel may proceed.

"TC: I would like to ask each member of the court, individually, to state whether or not he has any conscientious scruples against imposing the death penalty.

"TC: Colonel Kyle?

"COL. KYLE: No.

"TC: You have no mental or moral reservations in this respect?

"COL. KYLE: That's right. I have none.

"TC: Colonel Lucas?

"COL. LUCAS: No.

"TC: Colonel Stepp?

"COL. STEPP: Negative.

"TC: Colonel Macey?

"LTCOL. MACEY: I have none.

"TC: Colonel Singleton?

"LTCOL. SINGLETON: No.

"TC: Colonel Hempleman?

"LTCOL. HEMPLEMAN: None.

"TC: Colonel Starck?

"LTCOL. STARCK: I have none.

"TC: Colonel Raemy?

"LTCOL. RAEMY: No.

"TC: The prosecution has no challenge for cause."

It is argued that the trial counsel, by his statements to the court, sought inferentially to convey to the court members the desire of the convening authority that the death penalty be imposed. That contention misreads the record. The quoted portion makes it clear beyond cavil that Government counsel was interested only in determining whether any court member was conscientiously opposed to the death penalty. It was his right to do so. Manual for Courts-Martial, United States, 1951, paragraph 62b; United States v Riggins, 2 USCMA 451, 9 CMR 81. Moreover, if the inquiry had any effect, it was to impress upon the members the gravity of the proceedings in which they were engaged. That could hardly redound to accused's detriment. We do not so interpret the record. The assignment of error is overruled.

II

We are next urged to set aside the findings and sentence on the basis that the law officer instructed the court members that:

". . . Prima facie proof of an essential element of an offense does not preclude the existence of reasonable doubt with respect to that element. The court may decide, for instance, that the prima facie evidence presented does not outweigh the presumption of innocence. In law, prima facie evidence of fact is sufficient to establish the fact, unless rebutted."

We have considered the effect of this instruction in a number of cases. In each instance, it was held erroneous but not prejudicial. United States v Simpson, 10 USCMA 543, 28 CMR 109; United States v Adkins, 11 USCMA 9, 28 CMR 233. While the author has repeatedly recorded his views concerning the vice inherent in this advice to the court, the contrary view is now settled law. United States v Borsella, 11 USCMA 80, 28 CMR 304. Accordingly, the assignment of error must be held to be without merit.

### III

The accused next argues that the board of review failed to determine beyond a reasonable doubt that accused was mentally responsible. A reading of the board's opinion indicates that this contention is without merit. Counsel assigned before the board the question of the sufficiency of the evidence to establish accused's mental responsibility beyond a reasonable doubt. The board extensively discussed the issue, characterized it as a "question of fact," and concluded that it was "convinced" of the propriety of the court's findings. We agree with Government counsel that the board's opinion eloquently bespeaks its adherence to the proper measure of proof. Cf. United States v Moreno, 5 USCMA 500, 18 CMR 124; United States v Bunting, 6 USCMA 170, 19 CMR 296.

### IV

The balance of the assignments of error concern themselves with appellate action on the accused's death sentence. The record indicates that both the convening authority and the board of review considered themselves powerless to reduce the sentence to one involving dishonorable discharge, forfeiture of all pay and allowances, and confinement at hard labor for the term of accused's natural life. The accused also complains that the Acting The Judge Advocate General denied his request that the record be forwarded to the Secretary of the Air Force for the purpose of obtaining executive clemency prior to completion of our mandatory review.

We may at once dispose of the last-mentioned assignment. In his letter replying to accused's request for transmittal of the record to. the Secretary of the Air Force, the Acting The Judge Advocate General noted that the application was "premature" and that, in the event of affirmance by this Court, "executive clemency consideration will be given as required by Article 71(a), Uniform Code of Military Justice (MCM, 1951, par 101)."

The orderly administration of justice requires that The Judge Advocate General be permitted to determine whether an accused's record will be forwarded for clemency purposes prior to completion of normal appellate review. Otherwise, considerable confusion might be generated by having both executive and judicial action occurring at the same time. Moreover, if action were taken by the Executive branch to reduce the sentence and we subsequently ordered a rehearing on the merits, the new court-martial would be limited in the sentence which it could impose. United States v Jones, 10 USCMA 532, 28 CMR 98. Thus, there are good reasons for delaying consideration of administrative clemency action on accused's sentence until judicial review is completed. Certainly, we cannot say that, under the circumstances here presented, the Acting The Judge Advocate General erred in refusing to grant accused's request. Accordingly, we pass to the more important issue of the power of intermediate judicial authorities to mitigate the severity of accused's sentence.

Code, supra, Article 64, 10 USC § 864, provides:

**"§ 864. Art. 64. Approval by the convening authority**

"In acting on the findings and sentence of a court-martial, the convening authority may approve only such findings of guilty, and the sentence *or such part or amount of the sentence,* as he finds correct in law and fact *and as he in his discretion determines should be approved.* Unless he indicates otherwise, approval of the sentence is approval of the findings and sentence." [Emphasis supplied.]

Code, supra, Article 66(c), 10 USC § 866, provides:

"(c) In a case referred to it, the board of review may act only with respect to the findings and sentence as approved by the convening authority. It may affirm only such findings of guilty, and the sentence or such part or amount of the sentence, as it finds correct in law and fact *and determines, on the basis of the entire record, should be approved.*" [Emphasis supplied.]

The Government argues that this Court has previously interpreted the foregoing Articles of the Code as not authorizing intermediate appellate agencies to exercise the power of commutation. We turn to an examination of the cases in which it is contended that this result obtained.

In United States v Hunter, 2 USCMA 37, 6 CMR 37, we were confronted with the effect on a death sentence of our reduction in the findings of guilty to lesser included offenses with respect to related charges. The Court concluded that the changes in the findings of guilty would not cause any board of review to "commute the death sentence, assuming it had the power so to do." Thus, we delayed consideration of the issue now before us. See also United States v Long, 2 USCMA 45, 6 CMR 45, and United States v Day, 2 USCMA 416, 9 CMR 46.

In United States v Bigger, 2 USCMA 297, 8 CMR 97, the Court was faced with a related problem in interpreting Code, supra, Article 66 (c). There, the accused was found guilty of pre-

356

meditated murder and sentenced to death. The board of review concluded that the record of trial did not factually support the finding of premeditation and reduced the degree of the offense found to unpremeditated murder. It affirmed only as much of the sentence as involved dishonorable discharge, forfeiture of all pay and allowances, and confinement at hard labor for the term of accused's life. Before us, it was argued that the board of review had commuted the sentence. We unanimously held that, where a board of review approves findings of guilty of a lesser offense for which the death penalty is not authorized, Code, supra, Article 66 (c), granted the authority to "commute" the death penalty to life imprisonment. Significantly, we noted, at page 305:

"We have little doubt about the power of Congress to delegate to boards of review the right to commute sentences so long as the affirmed punishment did not exceed in severity the imposed penalty. Particularly would this be true when fact-finding bodies make determinations which render the imposed penalty illegal. Stated concretely, Congress could have expressly authorized boards of review to affirm a sentence of confinement in lieu of a death penalty. One could hardly reason that the former is not a lesser sentence although necessarily a different kind. *While not so stated in precise language, the authority to do so is found in the quoted provisions of the Code. There is no Congressional command that boards of review do not have the authority. The most that can be said in that respect is that the Act is silent."* [Emphasis supplied.]

In United States v Cavallaro, 3 USCMA 653, 14 CMR 71, it was remarked, at page 655, that "Article 66 (c) of the Code does not authorize a board of review to change the form of punishment imposed by a court-martial." That question was not before the Court, however, for we were there concerned only with whether the board of review abdicated its authority in affirming an approved sentence to dishonor-

able discharge, forfeiture of all pay and allowances, and confinement at hard labor for ten years, with a contemporaneous recommendation to The Judge Advocate General that substantial clemency be exercised in the case. In United States v Freeman, 4 USCMA 76, 15 CMR 76, however, the Court was faced with both the issue initially discussed in United States v Cavallaro, supra, and the question now before us. There, the board of review affirmed findings of guilty of rape and other offenses and a sentence of death. The board members, however, recommended that the sentence be commuted to life imprisonment. A majority of the Court squarely held that boards of review had not been granted the power to commute sentences. United States v Freeman, supra, at page 81. Chief Judge Quinn concurred only in the result. The reasoning behind his reservation in Freeman, supra, became apparent in United States v Goodwin, 5 USCMA 647, 18 CMR 271.

In United States v Goodwin, supra, the accused was sentenced to dismissal from the service. Concluding that the sentence was inappropriate, the board of review expressly commuted the dishonorable separation to loss of two hundred unrestricted numbers. Judge Latimer, with Judge Brosman concurring, exhaustively considered the history of appellate review in the armed forces, and concluded, at page 659:

"In hopes we will state the law as it is now provided for in the Code, and restate what we believe the law always has been in military services, we sum up our views. Specifically, only the Chief Executive and the Secretaries of the Departments or their Assistants, if so designated, have the power to change a dismissal from the service to any other form of punishment. Only the President can change a sentence of death to confinement for life or for a term of years. Generally, the President and the enumerated Secretaries and their Assistants alone can commute a sentence, and we use the word 'commute' in its generally accepted sense, that is, change in form. Mitigation we restrict to a reduction in kind."

Chief Judge Quinn vigorously dissented and pointed out his belief that Congress intended to clothe the boards of review with "the unqualified power, and the duty, to change a dismissal sentence which, on the basis of the whole record, it considers not to be appropriate punishment." United States v Goodwin, at page 659. See also opinion of Chief Judge Quinn, concurring in part, United States v Washington, 6 USCMA 114, 19 CMR 240, and concurring opinion of Judge Latimer in United States v Jefferson, 7 USCMA 193, 21 CMR 319.

Summed up, our prior decisions indicate that Judges Latimer and Brosman were of the view that boards of review lacked authority to change a death sentence or dismissal to a less onerous penalty. Chief Judge Quinn has consistently maintained that the majority of the Court misread Code, supra, Article 66(c). With due respect for the force of our prior opinions and the belief of my brother, Latimer, I am compelled to conclude that the Chief Judge's view accurately reflects the intent of Congress in conferring broad authority over sentences upon convening authorities and boards of review.

At the outset, a reading of Code, supra, Article 64, indicates that it expressly confers upon the convening authority the power to approve "the sentence or such part or amount of the sentence . . . as he in his discretion determines should be approved." (Emphasis supplied.) Indeed, we have said that he may properly refuse to approve any sentence. United States v Speller, 8 USCMA 363, 24 CMR 173. To grant to the convening authority that broad power under Code, supra, Article 64, and, at the same time, to deny him the right to reduce the most serious of all penalties to a lesser punishment is completely illogical. We should not attribute to Congress the intent to bring about such an absurd result, and reference to the Code's legislative history clearly establishes that they did not seek so to limit the convening authority in his action upon the case. The following colloquy during the hearings before the House Armed Services Committee is illuminating:

"Mr. SMART. Yes, sir.

"Now, article 64, on page 51. The point there was that the committee wanted to be sure that the convening authority had the right to remit any part of the sentence he wanted to, *that is, to do anything he desired with that sentence, so far as abating it was concerned.*

"So I would suggest on page 51, at line 17, immediately before the word 'determines' at the end of line 17, insert 'as he in his discretion,' *so that he is not then limited to the findings or sentence or anything else but his discretion.*

"*It becomes a discretionary matter with the convening authority as to what he shall do with any sentence which comes before him for review.*

"Mr. BROOKS. Any objection to that verbage? If not, we will adopt that." [Emphasis supplied.] [Hearings before House Armed Services Committee on H.R. 2498, 81st Congress, 1st Session, page 1266.]

The intent of Congress to grant equally broad powers to the board of review is even more clearly spelled out. Hearings before Senate Armed Services Committee on S. 857 and H.R. 4080, 81st Congress, 1st Session, page 42; Jackson v Taylor, 353 US 569, 1 L ed 2d 1045, 77 S Ct 1027, (1957); Currier and Kent, The Boards of Review of the Armed Services, 6 Vanderbilt Law Review 241, 242 (1953). Our recognition in United States v Atkins, 8 USCMA 77, 23 CMR 301, of its authority to affirm no sentence is indicative of the wide scope of its control over the appropriateness of the adjudged punishment. Moreover, as the Chief Judge pointed out in his separate opinion in United States v Goodwin, supra, Congress was specifically informed that the language of the then-proposed Article 66 would confer upon the boards of review the power to commute sentences theretofore enjoyed by the confirming authorities. Hearings before Senate Armed Services Committee, supra, pages 258–259, 285, 287. Nevertheless, the broad language was retained in the enacted legislation, and its purposeful inclusion is not strange

358

when one considers that a principal objection to the administration of military justice during World War II was the severity of sentences imposed by service courts-martial. As was said by Mr. Justice Clark in Jackson v Taylor, supra, at page 577, *et seq*:

". . . Military officials opposed giving the review boards power to alter sentences. . . . The Subcommittee nevertheless decided the boards should have that power. . . . The Committee Report to the Senate augments the conclusion that the boards of review were to have the power to alter sentences. A study of the legislative history of the Code in the House of Representatives leads to the same conclusion. . . . Article 66 was enacted in the language approved by the committees. It is manifest then that it was the intent of Congress that a board of review should exercise just such authority as was exercised here.

". . . Congress avoided the necessity for conjecture and speculation by placing authority in the board of review to correct not only the findings as to guilt but the sentence as well. . . . Military law provides that one aggregate sentence must be imposed and the board of review may modify that sentence in the manner it finds appropriate."

In short, there is little that can be added to the rationale of the Chief Judge's dissent in United States v Goodwin, supra, and I unqualifiedly adopt the reasoning set forth therein.

For the foregoing reasons, whether it be termed commutation, mitigation, or merely a reduction in ▉▉▉ ▉ punishment, we hold that both the convening authority and a board of review have the authority to lessen the severity of a death penalty by converting it to dishonorable discharge and confinement at hard labor. Our prior decisions in which the contrary view was expressed are overruled. It necessarily follows that this case must be returned to the board of review for implementation of its finding that no sentence in excess of dishonorable discharge, forfeiture of all

pay and allowances, and confinement at hard labor for life is appropriate. The approval of this lesser sentence will eliminate any necessity for return of the record to the convening authority level.

The decision of the board of review is reversed, and the record of trial is returned to The Judge Advocate General of the Air Force for action consistent with the views expressed herein.

Chief Judge QUINN concurs.

LATIMER, Judge (dissenting):

The only issue of consequence in this case is that upon which my associates predicate reversal, a result I am constrained to decry. In United States v Goodwin, 5 USCMA 647, 18 CMR 271, a majority of the Court as then constituted held specifically that boards of review did not have the power to commute sentences. Prior to that time, in United States v Bigger, 2 USCMA 297, 8 CMR 97, and United States v Cavallaro, 3 USCMA 653, 14 CMR 71, the Court had spoken to the same effect and the holdings there were germane to the issues. Moreover, our language in United States v Freeman, 4 USCMA 76, 15 CMR 76, which was also prior to *Goodwin,* was the same and parenthetically I note that that case—like the one at bar—involved the death penalty, commutation of which to life imprisonment was recommended by the board of review. In that instance the Chief Judge concurred only in result, but I invite attention to the fact that all three Judges of this Court there joined in affirming the decision of the board of review, which approved the death sentences.

Accordingly, I was hopeful that, in a field as critical as this, we would respect consistency, leave the law fixed, and rely on Congress to effectuate a change if it subsequently concluded that our construction was inappropriate. I was too credulous, for today's opinion sweeps the past aside, overturns a principle which has long been firmly inbedded in military law, refuses to follow prior decisions of this Court, and clothes two appellate agencies with power to impose an original sentence. Moreover, it gives to hundreds of military commanders and lawyers of field grade rank a prerogative which has been jealously limited to the Chief Executive, Secretaries of the Service, or specially enumerated boards. Historial precedents and canons of statutory construction ought to influence the majority not to change the law, but they apparently do not, for they refuse to look beyond their view that a reversal of our prior decisions is necessary to protect this accused. Experience teaches otherwise, for recommendations such as we find in this case are seldom, if ever, ignored by the President but, even if they were, it is not our province to redraft the law to accomplish a result we deem desirable.

In the above-cited cases, I have expressed my views on the power to commute and to repeat the arguments therein made is unnecessary. But there are one or two comments in the majority opinion which I think should be answered. As I read that opinion, the law is being changed because of Judge Ferguson's interpretation. No doubt he believes that he should undo the handicraft of Judge Brosman and the writer, but that position undercuts stability and offers comfort to those who assert that we are a court of men and not law. Certainly, if there is any merit to the doctrine of *stare decisis* and the argument that if Congress believes we misinterpret its enactment, the remedy is by corrective legislation, then this case is one of the best examples I can cite as a violation of those principles. The law today is exactly the same as it was at the time the Uniform Code was enacted, and our prior interpretation, if debatable, is clearly supportable. It was consistent with prior military law and bolstered by relevant canons of statutory construction. Moreover, over the intervening years those reviewing authorities who have considered cases involving death penalties labored under belief that they lacked the power to commute. How many of them would have exercised the authority had they been free to act I know not, but for this Court to do an about face at this late date makes abortive what we sought to do in *Goodwin.* We there realized that we should fix

**359**

the law because of the importance of the decision and the nature of the question with which we were dealing. We there set a crystal clear pattern which has now become clouded, and unfortunately that is not all for the decision casts a shadow on the validity of many sentences affirmed by this Court.

Two cases are relied on by the majority to support their conclusion that a change is demanded. The first is Mullan v United States, 212 US 516, 53 L ed 632, 29 S Ct 330, previously cited by the Chief Judge in his prior dissenting opinion. That case has language in it to the effect that the President mitigated a sentence when he changed a dismissal to a loss of files. The holding is inapposite in this setting, and reference to the opinion discloses that the author Justice concedes he is disregarding the true meaning of the words. In the background of that case he could do that as a casual comment because, regardless of the meaning he ascribed to the word it made no difference, for the Chief Executive had the power either to commute or mitigate. But I see no compelling reason for us to reject the ordinary meaning of words and phrases when they have been understood as words of art and used with precision and accuracy in military law for over a century and a half.

The other precedent upon which reliance is placed is Jackson v Taylor, 353 US 569, 1 L ed 2d 1045, 77 S Ct 1027. If my associates find support for their position in that case, I do not. The issue there had nothing whatever to do with the power to commute. The accused had been sentenced to life imprisonment, which punishment was mandatory. When the board of review reversed the findings of premeditated murder and affirmed only the findings of attempted rape, it concluded a sentence of twenty years was appropriate. The division of the Supreme Court in that case arose over the power of the board of review to determine the appropriateness of punishment for attempted rape which, because of the mandatory sentence that was eliminated by the board's holding, may or may not have been considered by the

court-martial. A majority of the Court held that the board could fix the punishment, and these are the words used by the author Justice:

" . . . Petitioner finds the language of this section ambiguous and argues that any ambiguity must be resolved in favor of the accused. That would be true if there were ambiguity in the section. But the words are clear. The board may 'affirm . . . such part or amount of the sentence, as it finds correct. . . .' That is precisely what the review board did here. It affirmed such part, 20 years, of the sentence, life imprisonment, as it found correct in fact and law for the offense of attempted rape. Were the words themselves unclear, the teachings from the legislative history of the section would compel the same result."

That is the extent of the holding in Jackson v Taylor, supra, and to infer that the Supreme Court was considering, even remotely, the power of a board of review to commute is stretching the point beyond recognition. Parenthetically, I note that some of the discussion found in that opinion is subject to a construction rendering it contrary to many of our decided cases. See United States v Miller, 10 USCMA 296, 27 CMR 370. Thus, it is plain to me that we should not strive to expand that holding beyond its fair confines. True it is, as stated in Jackson v Taylor, supra, that some military officials opposed granting the boards of review the power to reduce sentence, but I do not find commutation mentioned by any member of Congress. My associates must be of the same opinion for, to support their contention that Congress was specifically advised that commutation was encompassed within the terms of Article 66(c), Uniform Code of Military Justice, 10 USC § 866, they seize upon two isolated statements from a lengthy letter written by Major General Green and the short remarks of Rear Admiral Russell. A weaker rod could not be used, for the statements must be interpreted in the light of the then existing law, and at that time the authority granted

360

the power to confirm a sentence had been given a limited authority to commute. The thrust of the comments was not to change the existing law but to leave it as it was in the statute book.

One ground of the present opinion which was not developed by our earlier decisions is that the prior construction of Article 66(c), supra, which is now struck down, is illogical. One quotation from the Hearings before the House Armed Services Committee is used to support that declaration. The quoted language deals with Article 64, Uniform Code of Military Justice, 10 USC § 864, but does not indicate the convening authority has power to commute, and if my associates would refer to page 1183 of those Hearings, they would ascertain the committee was continuing a discussion of the power of the convening authority to reduce a sentence from ten years' confinement to a one-year period. In suggesting broad powers, the members were interested in giving the convening authority a free hand to reduce or disapprove a sentence.

I assume from the statements in the principal opinion that our prior construction was contrary to sound reasoning because Congress evidenced an intent to give reviewing authorities broad reductive powers in the sentence field, and yet we restricted these same authorities by our holding that they were not granted the right to commute death sentences. Aside from the history of capital punishment which I believe supports our previous interpretation, I wonder if present-day events do not quite effectively prove the wisdom of our prior decisions in construing the Code to limit that power to the President. Surely it is common knowledge that very recently the Chief Executive of one of our sovereign states encountered a soul-searching decision in trying to determine whether he should intervene to prevent execution of an accused under sentence to death. In making that decision, the final arbiter must weigh the right of society to exact a life against the belief that it is abhorrent to take a human life as a form of punishment and as a deterrent to others who refuse to live according to the norms of society. Because of the delicacy of the decision, the moral and religious concepts to be taken into account, and the judgment required to weigh the issue involved, I suggest that the States and the Federal Government have restricted the power to make that decision to either the Chief Executive or some board manned with individuals of experience and judgment who have under their direction and control persons trained in penology and with the means to collect, evaluate, and consider clemency data.

It happens that the writer of this dissent has served as a member of a board of pardons which had the responsibility the Court now saddles on boards of review and convening authorities. Even with a parole and probation department, psychologists, psychiatrists, penologists, investigators and other employees who had majored in the study of punishment for crime to assist and advise, the decision to commute, or not to commute, was troublesome and charged with humanities neither apparent to the senses nor obvious to the intelligence. Convening authorities and members of boards of review must necessarily make their decision principally from a cold and unilluminating record with few guideposts to chart their course. While I have no desire to cast aspersions on the capabilities of individuals who serve in those capacities, I do suggest that to force them to pass on the appropriateness of a death sentence is inconsistent with their experience, training, and lack of investigative processes or help. I am not contending for or against the wisdom of capital punishment for that is beyond the scope of my authority. Rightly or wrongly, Congress has decreed that for the commission of certain offenses the accused may suffer the death penalty. Furthermore, it has decreed that the court-martial must fix the penalty and, if the court sentences an accused to die, a change of that punishment should be made only by those in positions of great responsibility who, if they are uninformed in the particular case, can gather the facts and obtain the advice of those who may be familiar with the problems. Not only

is it unfair to saddle this duty of determination on anyone else, but the laws assigning this responsibility and prescribing the system in the civilan community bespeak eloquently the lack of wisdom in conferring the power so generally.

I need not go beyond the experiences of this Court to prove the seriousness of this problem. To date we have affirmed a number of cases in which the accused have been sentenced to die. At the appropriate time the records have been forwarded to the President of the United States and, while in some instances he has been able to rule with relative promptness on the appropriateness of the sentence, in other cases the investigative phase alone has taken months. The problems and responsibilities become acutely apparent when consideration is given to the concept that the punishment should fit the crime and the offender and in most instances the offenses which have resulted in the death sentence have been horrific. Because the President must weigh the ultimate consequence to the accused against the impact on society and the Services, I am sure that all Chief Executives who have been faced with this decision have spent many a troubled moment in their endeavor to decide rightly. Therefore, I am not willing to find that Congress concluded it was a routine decision which could be made by the hundreds of officers authorized to convene a general court-martial and the many lawyers ordered to sit on boards of review. And it is no answer to say the question is not of significant importance because the reviewing authorities can only reduce the sentence and thus the accused cannot be harmed. That is all any Chief Executive can do, but I suggest that the decision involves something more than a largesse to the accused, for society has some interest in its own protection. Cf. Judge Ferguson's separate opinion in United States v Walker, 7 USCMA 669, 23 CMR 133.

While I have discussed largely the power to commute the death sentence, I go on to point out that by authorizing the convening authority and boards of review to commute all sentences, my associates may open up a Pandora box. In the appellate processes, the sentence may be changed to such an extent that it will never be recognized. Under the law as now announced, every reviewing authority, officer exercising general court-martial jurisdiction, and board of review may change every sentence not only as to amount but as to kind. Each individual will be entitled to convert forfeitures to confinement and vice versa. That may lead to a crazy-quilt pattern of punishment and not the uniformity hoped for by Congress. Each reviewer may use a different measuring rod, and the Table of Maximum Punishments can be bartered away. Moreover, when a board of review can completely change the punishment believed to be appropriate by the convening authority, I am afraid the officers who have the superior opportunity for personalized evaluation of the offender as well as the responsibility for training the command and winning the war, may be handicapped not only in disciplining members of their organization but in rehabilitating those offenders who may be worthy. Different types of punishment may have a different effect on different men, and the man at the trial level ought to know best the necessary and appropriate punishment to be imposed. But, in addition, beneath the doctrine of commutation is the right of the accused to accept the substitution. His appeal to a convening authority and board of review is automatic, and he may disagree with them on whether the newly imposed punishment is less than was meted out by the court-martial. I wonder if he is not entitled to a hearing on that issue and whether all reviewing authorities will become boards for the reimposition of sentences.

Further, I wish to point out that this decision will probably have the additional undesirable effect of slowing down the appellate process. Not only are convening authorities and boards of review ill-equipped properly and wisely to discharge this new power, and thus under a tremendous handicap, but, in addition, it must be noted that the exercise—for better or worse—of the power of commutation by authorities

who formerly were not believed to possess it, will necessarily impede completion of consideration of cases on their merits, and thus tend to clog appellate channels.

Lastly, I point out that the disposition ordered by the Court does not reveal the entire thrust of the holding. In this instance, because the convening authority recommended a reduction to life imprisonment and a board of review found the recommendation appropriate, my associates direct assessment of that sentence. Recommending commutation to others is, however, different from ordering such action, and authorities finding themselves saddled with the latter responsibility might conceivably reach a different result. Moreover, it should be borne in mind that when a convening authority has been misled by this Court's erroneous construction of the law, he should be given an opportunity to reconsider his action using a proper measuring rod. Likewise, since this decision gives to him and the board of review the power to commute, it must be remembered that they are not limited to affirming a life sentence. The thrust of the majority opinion is that they are running in an open field, hemmed in only by the proscription that they cannot increase the punishment adjudged by lower authorities. While a court-martial may be limited to imposing a sentence of death or life for premeditated murder, once the case is in appellate channels the reviewing authorities are not restricted. In that connection, I particularly note this quotation emphasized in the majority opinion:

"It becomes a discretionary matter with the convening authority as to what he shall do with any sentence which comes before him for review."

If that means what it states, reviewing authorities can go all the way down the scales of punishment. That statement is not a hyperbole, and I refer to United States v Jefferson, 7 USCMA 193, 21 CMR 319, to prove the assertion. In that case, we said there were no restrictions on the convening authority and boards of review in lessening a mandatory life sentence. That

record shows the accused was convicted of premeditated murder and sentenced to life imprisonment. The board of review concluded that a life sentence for premeditated murder was mandatory and it was powerless to pass on the appropriateness of the sentence for purposes of reduction. Chief Judge Quinn was the oracle for a majority of the Court, and I quote his language:

"The punishment prescribed by Article 118 for premeditated murder can be construed as an absolute minimum for the reviewing authorities as well as for the court-martial. That is the view apparently taken by the board of review. On the other hand, subject to the possible difference between commutative and mitigative action (see United States v Freeman, 4 USCMA 76, 15 CMR 76), the Article can also be interpreted as applying only to a court-martial; thus, appellate authorities would be free to reappraise the appropriateness of the sentence in the normal exercise of their review powers.

"In United States v Lanford, 6 USCMA 371, 378, 20 CMR 87, we pointed out that at the time of the enactment of the Uniform Code, Congress was greatly concerned with 'the establishment of a procedure for review of the sentence which would insure a fair and just punishment for every accused.' Interpreting the Congressional purpose in regard to the very matter in issue, the Manual for Courts-Martial, United States, 1951, paragraph 88c, notes that 'when a court has adjudged a mandatory sentence to imprisonment for life . . . the convening authority may approve any sentence included in that adjudged by the court.' We think that this construction of the Uniform Code is a correct one. It follows then that, under like circumstances, a board of review can also treat the accused with less rigor than its authority permits. United States v Lanford, supra. Consequently, the board of review erred in its determination that it lacked the power to ameliorate the sentence without changing the findings of guilty."

Unless we are to overturn that case, along with the others herein mentioned, then it inevitably follows that a convening authority or a board of review can commute, reduce, or abate entirely a death sentence and that if in their discretion they decide a small fine is adequate, the Government is without remedy to review their ruling. United States v Walker, supra, illustrates the rule enunciated in *Jefferson,* supra. In *Walker* the accused was convicted of premeditated murder, which in due course was affirmed by a board of review. He had been sentenced to life imprisonment by the court-martial, but the convening authority reduced the term of incarceration to twenty years and the board found ten years confinement appropriate. But, assuming for the moment that reviewing authorities can go no further than to reduce a death penalty to life imprisonment, under current regulations that term for probation purposes is considered as being 45 years. That means that an accused sentenced to life imprisonment may be eligible for parole in fifteen years. What I have previously stated about the inadequate aids to assist convening authorities and boards of review in arriving at a proper decision on commutation applies equally to a determination of the total time the accused should remain in prison. I know the President has set periods longer than 45 years, but I doubt that information available to other reviewing authorities would be sufficient to permit an intelligent decision on the length of time a person should serve before qualifying for release, even if they had the authority to change the prison regulations.

Having treated the matter generally, I now fit my concepts to the facts of this case. The accused some six days before the homicide announced he was going to kill someone. He obtained the necessary equipment to do so, and on the fateful date the victim unfortunately walked into a toolroom to return some tools. Without justification or excuse he was shot by the accused and fell to the floor seriously wounded. As he sought to arise, the accused noticed his movement and, to make certain

that the helpless victim would not live, deliberately shot him a second time.

The facts related above are not in dispute, and the sole issue was and is insanity. Without choosing sides on that issue, it can be stated fairly that there is ample evidence to sustain the court-martial's finding that accused could premeditate and that he was mentally responsible for his homicide. All subsequent reviewing authorities have also found beyond a reasonable doubt that accused was sane and that he had the mental capacity to premeditate. Each of those issues was submitted to the court-martial under appropriate instructions, and no error save the one under discussion has been found which prejudiced the substantial rights of the accused. In the light of these matters, one is impelled to inquire as to the reason for the recommendation that accused's sentence be commuted to life. As a starting point, it should be obvious that it is much easier and less mentally upsetting for a person to recommend commutation than it is to make the decision himself. With that in mind, I consider the record for reasons. There I find a psychiatric analysis, a post-clemency report, and recommendations of a number of individuals which point up the fact that the accused was suffering from a character disorder. In addition they established that the convening authority was subjected to all of the pressures and influences that usually are brought to bear on those who must consider the appropriateness of death sentences. The reasons advanced for commutation in this case range from the effect of a partial impairment of accused's mental processes to the futility of capital punishment. As may be suspected the military authorities were divided. The staff judge advocate was opposed to any recommendation for clemency, but the convening authority chose otherwise. In doing so, I am sure he considered the possibility that the President of the United States would take a long and careful look at all the factors influencing clemency, including the recommendation, and that the President would make his decision based upon the proper weighing of all

factors. I much prefer a construction of the statute which vests the power in the President to the alternative ordered by the court; namely, that hundreds of officers can now commute death sentences. That holding in effect tosses the gravest responsibility imposed by a criminal code upon the shoulders of too many individuals who are unconditioned and ill-equipped for the burden.

For the foregoing reasons, I would affirm the decision of the board of review.