UNITED STATES, Appellee

v

HERBERT L. CASH, Airman Second Class,
U. S. Air Force, Appellant

14 USCMA 96, 33 CMR 308

No. 15,524

June 28, 1963

*Captain Hugh J. Dolan* argued the cause for Appellant, Accused. With him on the brief were *Colonel Daniel E. Henderson, Jr.,* and *Colonel Joseph E. Krysakowski.*

*Captain Richard T. Yery* argued the cause for Appellee, United States. With him on the brief was *Lieutenant Colonel Emanuel Lewis.*

## Opinion of the Court

QUINN, Chief Judge:

This case is before us for the second time. On the original review we reversed the decision of the board of review and directed further proceedings before a competent general court-martial authority because the post-trial review was prepared by a disqualified staff judge advocate. United States v Cash, 12 USCMA 708, 31 CMR 294. The conviction and sentence were again approved by a general court-martial authority; and, with some modification of the forfeitures, were affirmed by the board of review.

The accused was convicted of two specifications of conspiracy to present a false claim against the Government and two specifications of accepting graft, in violation of Articles 81 and 134, Uniform Code of Military Justice, 10 USC §§ 881 and 934, respectively. In broad outline, the record of trial shows the accused was a military pay clerk in the Finance Office at the Zaragosa Air Base, Spain. Airman William C. Geiger knew the accused. In need of money, Geiger asked the accused if there was "any way" he could get $100.00. The accused told him it could be arranged if he were paid $10.00. The next day the accused telephoned Geiger to inform him that a "TWX from Denver" had been received, which stated "the Government owed . . . [Geiger] $100." He also told Geiger the transaction would not be entered on his payroll, and for that reason it was "worth $10 more than the $10" Geiger had agreed to pay. Geiger acceded to the increase. That afternoon he went to the Finance Office and "picked up $100." Geiger's finance records, which include a "Military Payroll Money List" signed by him, show $100.00 was paid to him because of an "Error in computation" during the previous payroll period. Also included in the records, in the handwriting of the accused, is a "Pay Authorization Slip," which lists the purpose of the payment as "Short Pay." The Slip indicates the amount was entered on Geiger's record by the accused.

After Geiger obtained the $100.00 from the Finance Office, he left $20.00 for the accused with the Charge of Quarters in his orderly room. Later that day the accused appeared at the orderly room and received from the Charge of Quarters the money left by Geiger. About a week later the accused "contacted" Geiger to borrow some money. When Geiger represented he had none "to spare," the accused suggested Geiger get $100.00 from Finance as he had on the previous occasion and give him $20.00. Geiger agreed. He went to the Finance Office and was given a Pay Authorization Slip by the accused, which stated that it was issued for the purpose of making up "Short Pay." Geiger presented the Slip to the cashier and received $100.00. Shortly thereafter he met the accused in the orderly room and gave him $20.00. The accused admonished Geiger "to be sure not to tell anybody else about it."

In two related assignments of error, the accused contends there is no evidence to support the findings of guilty of the pre- ██ sentment of a false claim. The contention is based primarily on testimony by Geiger to the effect that his agreement with the accused was "to try to get some advance" on his pay, and that the amount drawn would be "deducted from . . . [his] pay in the future." A request for an advance in pay impliedly acknowledges the

98

amount requested is not legally due. At least semantically, therefore, it would appear that such a request is not a "claim" within the meaning of Article 132 of the Uniform Code, 10 USC § 932, in that it does not purport to be a charge for which the Government is legally liable. See United States v Byron, 223 Fed 798, 800 (D Ore) (1915); State v Third Judicial District Court, 87 Utah 416, 49 P2d 950 (1935). However, there is more to Geiger's testimony than the part quoted above; other parts of his testimony amply support the conclusion that he may originally have intended to get only an advance in pay, but later joined the accused in presenting a false claim for "Short Pay."

The court-martial was free to reject one part of Geiger's testimony, and give weight to other parts of it. It could reasonably find from the evidence that Geiger believed the accused's story about the receipt of a telegram from Denver was concocted to cover the false payment; and it could find from the notations on the Pay Authorization Slips that Geiger knew he was filing for "Short Pay." Geiger admitted the arrangements for the second payment were not made to enable him to draw accrued pay, but to help the accused raise money for himself. Thus, despite Geiger's partial disclaimers at trial, there is substantial evidence to support the finding of an agreement between him and the accused to present false claims for accrued pay.[1]

Moving to the post-trial review by the staff judge advocate, the accused maintains it is materially deficient. The first deficiency, which was asserted on the original appeal, is the failure of the staff judge advocate to mention in his summary of Geiger's testimony that Geiger admitted he had been convicted of assault with intent to commit sodomy and at the time of trial was in confinement under that conviction. When we remanded the case for new post-trial proceedings, we indicated "the accused may present such matters as he deems appropriate to correct the purported omissions in the earlier review." United States v Cash, supra, page 710. Unaccountably, however, the new review suffers from the same deficiency. The Government says it does not "condone the omission," but it insists the accused was not prejudiced by it. Cf. United States v Hardy, 12 USCMA 513, 31 CMR 99.

The question of prejudice from the failure to mention the fact of Geiger's conviction is complicated by the previous argument that the evidence is insufficient to show presentment of a false claim. The latter argument is based on the alleged truthfulness of part of Geiger's testimony; but the present contention is aimed at discrediting a different part of his testimony.[2] However, we put aside this difference of approach to consider whether, in the circumstances of this case, Geiger's conviction was sufficiently important to present a fair risk that the convening

---

[1] A second phase of the accused's argument deals with whether the mere signing of a military payroll constitutes the presentment of a claim for the amount received. We considered the matter in United States v Field, 3 USCMA 182, 185, 11 CMR 182, and held it was not necessary to reach the issue. According to the evidence here, Geiger did more than just sign the Military Payroll Money List. He testified he personally presented the Pay Authorization Slip for the second payment to the cashier. This Slip is used for payments on other than regular paydays for persons who "claim they were underpaid." The court-martial could reasonably infer from the evidence that

the Pay Authorization Slip for the first payment was also presented by Geiger. Consequently, there is direct evidence of the presentment of a claim for pay on each occasion.

[2] The same problem faced defense counsel at trial. In regard to the conspiracy charge the evidence required him to argue, and he did in fact argue, that the court-martial should believe Geiger's testimony that the agreement was merely to get an advance in pay. As to the charge of graft, however, defense counsel had to argue that Geiger lied when he said he gave the accused $20.00 on each of the two occasions the accused arranged for a $100.00 payment.

authority was misled in his evaluation of the weight of Geiger's testimony. Appellate defense counsel contend that this case is "closely akin" to the situation in United States v Blackwell, 12 USCMA 20, 22, 30 CMR 20. In that case, we directed a new post-trial review because the staff legal officer failed to inform the convening authority of "the possible effect of the witness' impeachment" by prior inconsistent statements and the admission of several homosexual acts; failed "to rationalize the probability of . . . [his] truthfulness in light of the attack upon his credibility"; and failed to call attention to the legal effect of substantial character evidence presented by the defense. The umbrella of the *Blackwell* decision is too small to shield this accused.

As indicated earlier, Geiger's incriminating testimony was substantially corroborated by the finance records; admissions of the accused; and the testimony of the Charge of Quarters. Measured by the evidence, there is little likelihood that Geiger's conviction, although for a serious and detestable offense, tended to diminish the worth of his testimony. Even before the court-martial, the conviction was regarded as unrelated to the case against the accused. After defense counsel elicited the information from Geiger, he made it a point to have him confirm the fact that the conviction had "nothing to do with the offense in this case." The reason for giving only passing attention to the conviction is evident from the record.

Geiger had been given a grant of immunity. In attacking Geiger's credibility defense counsel hit hard on that point, but only as to the graft specifications. He contended the grant of immunity gave Geiger freedom to "implicate the accused . . . to cover up for someone else"; and to say "anything he wants . . . without fear of any reprisal." The only reference to the conviction was that "Geiger . . . [was] a *convicted* criminal who has been granted immunity." (Emphasis supplied.) No mention was made of the matter in the argument emphasizing Geiger's testimony that he agreed only to obtain an advance in pay. The minor role assigned to the conviction at trial by defense counsel explains the staff judge advocate's disregard of it. It also makes it unlikely the convening authority would have given it any more consideration than it received at trial. We conclude, therefore, that the failure to mention the matter in the post-trial review did not prejudice the accused. United States v Hooper, 11 USCMA 128, 28 CMR 352.

A second deficiency asserted against the review is that it omits many alleged inconsistencies in Geiger's testimony and disregards the theory of defense. The staff judge advocate might indeed have said more than he did about the part of Geiger's testimony indicating his belief that he was merely obtaining an advance on his pay. However, if the post-trial review is not to repeat the transcript of the trial proceedings, it necessarily must be selective in setting out the evidence. Selectivity is explicitly recognized in the Manual requirement that the review contain a "summary of the evidence in the case." Manual for Courts-Martial, United States, 1951, paragraph 85*b*; United States v Fields, 9 USCMA 70, 25 CMR 332. Even if we are able to do so, we would not be inclined to fashion a template for the delicate process of selection. It is, in our opinion, better to leave the matter to the sound, professional discretion of the individual staff judge advocate, subject to the right of the accused to review the exercise of the discretion for abuse. United States v Blackwell, supra; see also United States v Foti, 12 USCMA 303, 30 CMR 303; United States v Jemison, 10 USCMA 472, 28 CMR 38. We find no abuse in the selection of the evidence set out in this review.

Turning to the sentence, appellate defense counsel maintain the staff judge advocate violated Air Force policy, and erred to the accused's prejudice by failing to inquire into the accused's conduct in the period between the first and second reviews. See Air Force Manual 110-8, paragraph 65; United States v Coulter, 3 USCMA 657, 14 CMR 75.

100

They contend that since the accused was in confinement for a substantial part of this period, "presumably" he was subject to detailed studies of his conduct, character, and rehabilitative potential. See United States v Franchia, 13 USCMA 315, 32 CMR 315. They also note that between the two reviews, the Secretary of the Air Force directed the substitution of an undesirable discharge for the bad-conduct discharge imposed by the court-martial. As neither of these matters was mentioned in the review, counsel argue that it is patently *pro forma*. They say further that it deprived the accused of what this Court has called the "right to a careful and individualized" evaluation of the accused's "worth to his service, and his country." United States v Wise, 6 USCMA 472, 476, 20 CMR 188; see also United States v Martin, 9 USCMA 84, 86, 25 CMR 346.

As to the confinement studies, the record does not support the defense "presumption" of availability. The accused's conviction was approved by the Convening Authority of the Sixteenth Air Force, United States Air Force, on June 27, 1961. Pending appellate review, he was returned to the United States. On arrival, he was confined in the United States Disciplinary Barracks at Fort Leavenworth, Kansas. He was released from confinement some months before preparation of the post-trial review, and was assigned to a squadron at Scott Air Force Base, Illinois. No report of his conduct at the Disciplinary Barracks appears in the record. The proceedings by which such reports are compiled tend to indicate they would be maintained only as part of the records of the Disciplinary Barracks. See United States v Franchia, supra. It is doubtful, therefore, that the reports were available to the staff judge advocate for the post-trial review. However, assuming there were records of the accused's conduct in confinement, and assuming further these were available to the staff judge advocate, we are unable to accept the suggestion that the failure to summarize the records in the post-trial review prejudiced the accused.

We are not informed of the exact nature of the accused's conduct during confinement; it may have been favorable or merely indifferent. Appellate defense counsel themselves make no greater claim than that the accused's conduct "must have been satisfactory" because he was released "early" from confinement. Satisfactory conduct in confinement may merit the allowance of good time and justify release before the expiration of the time provided in the sentence of the court-martial. But, in the context of the offense and the myriad of other background considerations, it may not be sufficient to justify restoration to the service. In its worst aspect, the failure to refer to the accused's conduct is an unfortunate omission of relevant matter. However, assuming the accused's conduct was good, it was not materially different from his general conduct before confinement. That subject was developed fully in the review. In addition, the staff judge advocate pointed out that the first sergeant of the unit to which the accused was assigned after release from confinement was of the opinion the accused's performance of duty was "more than satisfactory"; and he believed the accused had "learned his lesson" and could continue to perform "satisfactorily as a member of the Air Force." We conclude, therefore, that the failure to cover the accused's conduct during confinement was not prejudicial.

Considering the action of the Secretary of the Air Force, appellate defense counsel contend that it eliminated the bad-conduct discharge and prevented the convening authority from affirming that penalty as part of the sentence. See United States v Russo, 11 USCMA 352, 29 CMR 168. While we admit to the same doubt appellate defense counsel express, as to the utility of reviewing the appropriateness of a punitive discharge in the face of an outstanding direction by the Secretary of the Department to separate the accused by way of an administrative discharge, we are nonetheless bound to consider whether it had any legal effect upon the judicial powers of the convening authority. See United States v Powell, 12 USCMA 288, 30 CMR 288; United

States v Dunn, 9 USCMA 388, 390, 26 CMR 168.

On February 15, 1962, the Provost Marshal General of the Army formally advised the Commandant of the United States Disciplinary Barracks, Fort Leavenworth, Kansas, that a clemency and parole application for the accused had been disapproved. In the same letter action, attention was called to an enclosed "official communication" from the Secretary of the Air Force directing the issuance of an undesirable discharge certificate at the expiration of the accused's detention. The Provost Marshal's letter requested that the Secretary's action "be incorporated in the general court-martial order ordering the sentence into execution." The "communication" by the Secretary of the Air Force recited that "so much of the sentence as provides for bad conduct discharge as initially promulgated . . . is changed to an undesirable discharge." The board of review read the letter and the Secretary's action together, and concluded that the latter was not intended to take effect until "appellate review of this case is complete and execution of the sentence authorized."

Read literally, the Secretary's action changed the character of the discharge *eo instanti*, without regard ■ to completion of confinement or appellate review. However, the action was in no sense published or officially communicated to the accused. Cf. United States v Shulthise, 14 USCMA 31, 33 CMR 243. It was transmitted to the Disciplinary Barracks as part of an official notification of disapproval of clemency and parole for the accused. The letter of transmittal was inseparable from the Secretary's "communication," and must be read with it. See United States v Griffin, 13 USCMA 213, 32 CMR 213; cf. United States v Brown, 13 USCMA 333, 32 CMR 333. Considered together, the two instruments clearly indicate the change in the nature of the discharge was not to be made until the accused's sentence was ordered into execution by an appropriate general court-martial order. Postponement of "administrative clemency action" until completion of judicial review of accused's conviction is supported by sound reasons, some of which we commented on in United States v Russo, supra, page 355. We agree with the board of review, therefore, that the convening authority was not legally bound by the Secretary's action to approve a sentence which did not include the bad-conduct discharge of the court-martial.

The decision of the board of review is affirmed.

Judge KILDAY concurs.

FERGUSON, Judge (concurring in part and dissenting in part):

I concur in part and dissent in part.

I agree that the evidence in this record is sufficient in law to support the conspiracy charges of which this accused has been found guilty. United States v Wilson, 13 USCMA 670, 33 CMR 202; United States v Guerra, 13 USCMA 463, 32 CMR 463; United States v Reid, 12 USCMA 497, 31 CMR 83. I am of the view, however, that it was prejudicial for the staff judge advocate again to omit from his post-trial review the fact that the principal witness against the accused had been convicted of assault with intent to commit sodomy. The case in the main turns upon that witness' testimony, and it is only fair and proper that the convening authority be allowed to judge his credibility in light of all important factors affecting it. Moreover, this is the second occasion on which this matter was omitted from the review and, in our previous opinion, we specifically pointed up the failure of the staff judge advocate to mention the matter. United States v Cash, 12 USCMA 708, 31 CMR 294. Under the circumstances, I am left to wonder at the motivation for the omission of such a significant factor on two occasions.

In United States v Blackwell, 12 USCMA 20, 30 CMR 20, we pointed out, at page 22:

". . . [W]e suggest that a substantial question existed concerning whether accused was factually guilty and that the convening authority should have been afforded an ade-

quate rationalization concerning the review's ultimate conclusion, including advice as to applicable legal principles, in order that he might reach an informed decision on the record. . . . We need hardly add that it is not whether accused testifies that is the controlling consideration, but merely whether the evidence creates a factual issue concerning his guilt or innocence."

In the *Blackwell* case, it was specifically noted that the review "stated nothing to the convening authority of the possible effect of the witness' impeachment upon cross-examination, nor did it seek to rationalize the probability of . . . [the witness'] truthfulness in light of the attack upon his credibility." In this case, the principal attack upon the witness' credibility—his conviction of a major felony—was not even made known to the convening authority. In light of this record, there is more than a fair risk that concealment of such knowledge affected the course of appellate review, for the evidence in the transcript "creates a factual issue concerning . . . [accused's] guilt or innocence." United States v Blackwell, supra, at page 22.

My brothers seek to avoid the effect of our decision in *Blackwell*, supra, by relating the evidence and stating, in effect, that the convening authority's action on the record would not have differed had he known of Geiger's conviction. To me, that is a gross usurpation of that officer's function. It is he, not we, who is empowered to judge the credibility of the witnesses, decide controverted questions of fact, and determine within his sole discretion, whether to approve the findings of guilty. United States v Grice, 8 USCMA 166, 23 CMR 390; United States v Fields, 9 USCMA 70, 25 CMR 332. Indeed, "He must be satisfied in his action that the accused is guilty *beyond a reasonable doubt.*" United States v Grice, supra, at page 169. We need only be satisfied there is competent evidence in the record to support that conclusion by the court-martial. United States v Wilson, supra; United States v Guerra, supra. And I am unwilling, under our present charter of authority, see Code, supra, Article 67, 10 USC § 867, to indulge in a guessing game concerning what his decision might have been had the review called his attention to the witness' conviction.

I would reverse the decision of the board of review and remand the case for a new post-trial review.